JOSHUA FRIESNER, petitioner,

*v.*

MORRIS SYMONDS, respondent.

1. The ordinary cannot appoint a guardian of a minor whose father is living, unless the child owns property.

2. In no civilized country can a man have two lawful wives at the same time.

3. The mother of a bastard child is its natural guardian, and as such, is bound to maintain it, and has a right to its custody and services.

4. An illegitimate child, on the death of its mother, becomes an orphan, and the ordinary may appoint a guardian for it.

---

On application for letters of guardianship, heard on petition, answer and proofs taken in open court.

*Mr. Samuel Kalisch,* for the applicant.

*Mr. Robert H. McCarter,* for the respondent.

THE VICE-ORDINARY.

This is an application for letters of guardianship. Joshua Friesner is the applicant, and the subject of his application is a female child, less than nine months old, born of the body of his daughter Celia. The child was born on the 17th day of November, 1889, and its mother died on the 30th day of the same month. The child is now, and has been since the death of its. mother, in the custody of the applicant. The application is resisted by Morris Symonds. He claims to have been the husband of the child's mother, and also, that the child was born in lawful wedlock, and hence insists that, as the child is without property or estate of any kind, this court has no authority to appoint a guardian for it.

The law is settled that the ordinary has no power to appoint a guardian of an infant, whose father is living, unless the infant holds property in its own right. Prior to the passage of the statute of 1843, now the thirty-eighth section of the Orphans Court act (*Rev. p. 760*), Governor Williamson, sitting as ordinary, decided that the ordinary had no power to appoint a guardian of an infant during the lifetime of its father, and also, that such power could not be conferred by the consent of its father. This decision was followed by Ordinary Green in *Morris* v. *Morris, 2 McCart. 239, 240*, and afterwards received the approval of the court of errors and appeals in *Graham* v. *Houghtalin, 1 Vr. 552, 569*. The statute of 1843 increases the jurisdiction of the ordinary in one case only. It gives him power to appoint a guardian of an infant, during the life of its father, provided the infant has an estate, but not otherwise. These are its words :

" If any minor shall become seized or possessed of, or be entitled to any real or personal estate in the lifetime of the father of such minor, the ordinary * * * may appoint the father, or other suitable person, guardian of the estate of such minor." *Rev. p. 760*.

This being the state of the law, it is clear, that if the child is legitimate, and without property, and Symonds is its father, this court is without power to appoint a guardian for it. The legiti-

macy of the child is, however, disputed, and the first question presented for decision is, whether it is legitimate or not. At one time there was a statute in force in this state which declared that all issues upon pleas or allegations of general or special bastardy should be tried by the country, and not otherwise. *Nix: Dig. 923 § 12.* · Whether that statute was intended to apply to cases like the one now under consideration, it is unnecessary to consider,. for, by the general repealer of 1875, it ceased to exist. *Rev: p. 1384 ¶ 50.*

Two important facts bearing on the question of legitimacy are free from dispute: *First,* that the mother of the child and. Symonds entered into a contract of marriage in September, 1888,. in the city of Newark, and afterwards lived together as husband and wife, and that the child in question is their offspring ; and,. *second,* that Symonds had, in December, 1885, in London, England, under a false name, contracted a previous marriage with. another woman, who was still living and undivorced from him, when he married the mother of the child. If Symonds's first marriage was valid, and he thereby became the lawful husband of the woman he married in London, then it necessarily follows, that his second marriage with the child's mother was invalid. In no civilized country can a man have two lawful wives at the same time. Symonds admits that he was married to a woman by the name of Esther Cohen in London, in December, 1885, but insists that his marriage with her was invalid because she then had a husband living. Having admitted a prior marriage, his second must be presumed to have been invalid until it is shown that his first was invalid. No presumption can be made against the validity of the first, but that, on the contrary, must be presumed to have been valid until it is proved that it was not. And the burden of proving that it was not rests on the party asserting its invalidity.

Symonds attempted to prove, by the oath of the woman herself, that at the time he married her in London she had another husband living. The woman so testified. She swore she was a native of Poland; that she emigrated to Hull, England, about eleven years ago, and there married a man by the name of Wolf

Schmitt; that Schmitt and she lived together in Hull two or three months ; he then went to London and she followed him there about two months subsequently ; that they lived together in London between two and three years, and she then left him because he did not treat her good. She also swore that Schmitt went to Australia with another woman about three months after she married Symonds. This constitutes the whole of the oral evidence tending to show that Esther Cohen had a husband living when she married Symonds. And the important question now is, can this evidence be believed. That depends, of course, entirely upon whether or not it proceeds from the mouth of a trustworthy witness, and also, whether or not it stands free from contradiction. In my judgment, the evidence possesses neither of these qualities. Esther Cohen cannot be considered a trustworthy witness. Although it appears as an undisputed fact in the case that Symonds treated her with almost brutal meanness, by secretly deserting her within less than ten days after he married her, and fleeing from her to this country, bringing with him £25 which she had given him to deposit in bank, yet, since then, her own conduct shows that she has become his partizan to such an extent that, although resident in the city of New York, where she was beyond the reach of the process of the courts of this state, she was willing, in order to aid him in this litigation, to voluntarily come forward and confess that she had been guilty of bigamy. She was not only willing to forgive, but also to confess her shame to help the man that had basely wronged her.

But this is not all the help she attempted to give. A few days before she was examined as a witness, she says, she gave Symonds a paper which, it is claimed, furnishes conclusive evidence of her marriage to Schmitt. The paper is in the Aramaic language. A translation of it shows that it is a second or substituted contract of marriage ; that it was executed in Saval, Russia, and that the parties to it were Wolf, the son of Mayer (the last name is obliterated), and Esther, the daughter of Leob Cohen. The part of the paper containing the date of its execution is gone, either having been torn off or worn away. After admit-

ting that a prior marriage contract had been executed by the parties, the paper says:

"But now the writ or contract was lost to her wherein it was written to her by me that she was married unto me; and the Rabbis say that it is forbidden for an Israelitish man to live with his wife without a marriage contract even one hour, and now therefore I wish to write to her another marriage contract in the place of the first one."

And then follow the promises made by Wolf to Esther. Symonds swears that he found the paper in his wife's trunk exactly four days before he abandoned her; that the next day he took it to the persons who were present at his marriage with Esther; that they read it to him, and then went with him to the registrar general in London, who informed him he was a free man, and that he then put the paper back in his wife's trunk. Esther, when asked, on cross-examination, whether she had kept any papers in her trunk, at first replied, "No;" but when the same question was repeated in this form: "No papers at all?" she replied, "My paper what I got married with; I got this paper." And when this question was put to her: "Did you have any kind of papers in your trunk?" she answered, "What for? Why do ask me that? I cannot make it out; what for do you ask me?" She then said that she had found the paper in question in a box in her trunk the week before, and that two days after finding it she had given it to Symonds. She also said that the paper had been in her trunk for so long a period that the fact that she had it had passed out of her mind. It thus appears, according to the evidence of Symonds and Esther, that the paper was never out of Esther's trunk, after she put it in, until she took it out herself, a week before she testified, except once, and that was when Symonds took it out clandestinely and exhibited it to the witnesses of his marriage and to the registrar.

The paper furnishes evidence which, in my judgment, makes it plain that the evidence of Esther should be rejected as unworthy of credit. Her story is, that she was married in Hull to Schmitt by a Jewish rabbi, whose name she does not remember. She says this paper is the one she got married with. This, the

paper shows, is not true. It is not the original contract, not the one given to her at the time of her marriage, but one executed .as a substitute for the original, because the original had been ;lost. It was not executed at Hull, where she says she married, but at Saval, Russia. She does not pretend that either Schmitt ,or she left England and went to Russia at any time during the three years they lived together. Her description of their rank .and condition in life renders it quite certain that they did not. 'She says she was married to Schmitt about eleven years ago. The paper furnishes very strong evidence that it was executed at .a much earlier date. The body of the paper is in a state of ..decay; it is limp and .weak; its color has apparently undergone :a very great change consequent upon the lapse of time; the ink, both of the printed and written parts, is faded, and portions of :the paper, at its folds, have been worn off or dropped out. The :antiquity of the paper, its contents, and the evidence which its :state and condition furnish respecting the manner in which, for :years, it has been handled and kept, all go to show, with great :force, that it is not what Esther has sworn it is.

Moreover, the evidence of Esther is strongly contradicted, :both by her own conduct and that of Symonds. In September, :1889, she brought an action, by the name of Esther Symonds, in :the supreme court of New York, against Symonds for divorce for adultery. She charged him in her complaint with having committed adultery in having sexual intercourse with the mother of the child which is the subject of the application. She swore to the truth of her complaint. Symonds was served personally with process in that action, but made no defence. Yet, if he possessed the knowledge which he now says he did, he knew that he was not her husband, and that he had a perfect defence to her action. The case was heard in open court. Esther was present and was examined as a witness. She swore that Symonds, under the name of Morris Yablinsky, had married her in London, in December, 1885. The adultery charged was proved, and a judgment of divorce pronounced. This is what the record ·shows. But Esther swore in this case, at first, that she had :never brought a suit against Symonds for divorce, but when a

more searching question was put to her, and she was required to declare distinctly, whether or not the suit brought in her name against him had been brought without her knowledge, the only answer she made was, " Well, I don't know." Both her conduct and that of Symonds, in the suit for divorce in New York, stand in such sharp and irreconcilable conflict with her evidence given in this case, that it is impossible, as I think, for any discriminating mind to believe her evidence. My conclusion is, that the subject of this application is illegitimate.

This result makes it necessary to decide another question, namely, has the ordinary power to appoint a guardian of a bastard whose mother is dead? In other words, is a bastard, whose mother is dead, an orphan? The jurisdiction of the ordinary to appoint guardians is, as has already been shown, limited. His power is limited to the appointment of guardians for minors who are orphans, except in one case, and that is where a minor, whose father is living, has an estate, and in such case the appointment will extend only to the estate of the minor and not to his person. An orphan is a minor who has lost one or both of his parents. This is the definition given by both Bouvier and Webster. But, according to the rule prevailing in this state, it would seem that a minor is not an orphan unless his father is dead. In legal theory a bastard is without parents. He is *nullius filius,* the son of no one. In the language of Chief-Justice Parsons, in *Wright* v. *Wright, 2 Mass. 109, 110,* " In legal contemplation a bastard is generally considered the relative of no one." By the common law he is of the blood of no one, and for that reason is incapable of taking property by descent or as next of kin. But while this is so, the law, from a very early day, has recognized the mother of a bastard as its natural guardian, and as such has imposed upon her the duty of its maintenance and given her a right to its custody and to its services. *Wright* v. *Wright, 2 Mass. 109, 110; People* v. *Landt, 2 Johns. 375; Somerset* v. *Dighton, 12 Mass. 383, 387; Petersham* v. *Dana, 12 Mass. 429, 433; People* v. *Kling, 6 Barb. 366, 367; Robalina* v. *Armstrong, 15 Barb. 247; People* v. *Mitchell, 44 Barb. 245, 249.* In this state we have gone further.

By statute we have recognized that a tie of blood exists between the mother and her illegitimate offspring. Our statute of distribution directs, that if she dies without leaving a husband, and leaving no lawful issue, the whole surplusage of her personal estate shall be paid to her illegitimate child or children ; and that if any illegitimate person shall die intestate and unmarried, and leave no lawful issue, the whole surplusage of his or her personal estate shall be paid over to his or her mother. *Rev. p. 785 § 147.* Another statute declares, that when any illegitimate person shall die seized of land in his or her own right, in fee simple, without devising the same, and without leaving lawful issue, the inheritance shall go to his or her mother, subject, however, to the right of the tenant in dower or by the curtesy, if there be one. *Rev. p. 1299 § 1.* These statutes establish the relation of parent and child between a mother and her illegitimate offspring. On the death of the mother of such a child, it is clear, I think, that the child, by force of our laws, becomes an orphan.

Letters of guardianship will be granted to the applicant.