### ARTHUR J. ROONEY

### v.

### HELEN F. ROONEY, otherwise Barry.

1. A marriage between parties, one of whom has a lawful husband or wife living, is absolutely void at the common law for all purposes.

2. There can be, strictly speaking, no decree of divorce dissolving such a marriage; the proper decree in such case is one declaring the marriage null and void *ab initio.*

3. Such a decree does not alter the relations of the parties, and its value consists in its effect by way of estoppel, and in bastardizing the issue of the parties to it.

4. A court of equity has original jurisdiction of an action to declare such marriage void, without the aid of any statute.

5. A statute of this state giving jurisdiction to the court of chancery over actions of divorce, does not, so far as regards actions for nullity, alter the intrinsic character of the action, or compel this court, in dealing with it, to act upon principles other than those governing it in ordinary suits.

6. A man who, being consciously under disability to marry by reason of having a lawful wife living, falsely represents himself to be competent to marry, and thereby induces an innocent woman to go through the ceremony of marriage with him, cannot maintain against her an action of nullity in a court of equity.

7. The contrary rule which prevails in the English ecclesiastical court does not govern this court.

8. In a suit for nullity by reason of precontract with a living person, strict proof is required of such prior contract.

9. An exemplified copy of a paper purporting to be a certificate of a marriage ceremony, signed by a person without any designation of character, and without proof of its genuineness, on file in the office of a clerk of a court of another state of the Union, without proof of the laws of that state, is not sufficient proof of such marriage ceremony to sustain a decree of nullity by reason of it.

Final hearing on pleadings and proofs in open court.

*Mr. Marshall W. Van Winkle,* for the complainant.

*Mr. Joseph A. McCreery,* for the defendant.

PITNEY, V. C.

The object of this suit is to procure a judicial declaration by this court that a contract and ceremony of marriage entered into between the parties was a nullity by reason of the prior hymeneal contract of the complainant with another woman, who was his living and lawful wife at the time of the later contract.

The bill alleges complainant's marriage with one Mary Tole, in Richmond, Virginia, May 18th, 1862, and again with the defendant, Helen F. Barry, on July 14th, 1894, at which time Mary Tole was living. The bill was filed December 4th, 1894.

The answer puts complainant upon proof both of the prior marriage and the continued life of the alleged prior wife. In fact, the allegation of continued life is not found in the bill, and must be considered as added by way of amendment.

At the hearing, complainant attempted to sustain the burden thus cast upon him—*first,* as to the marriage, by his own evidence and an exemplified copy of a writing on file in the hustings court of Richmond, Virginia; and *second,* as to the continued life of the first wife, by a witness who saw her shortly before the hearing.

Counsel for defendant attacked each of these pieces of evidence: as to the writing, that it is incompetent and insufficient for that purpose; as to the evidence of the complainant, that it is wholly unworthy of belief; and as to that of the witness to the continued life of the first wife, that the witness is not only unworthy of belief, but did not manifest sufficient acquaintance with the first wife to give reliable evidence.

Counsel for defendant took the further ground that, admitting the first marriage and the continued life of the first wife, yet the complainant procured the defendant to marry him by practicing upon her a fraud so gross as to close against him the door of a court of equity.

Rooney *v.* Rooney.

It is hardly necessary to cite authority for the position that a complainant who comes into court under the circumstances above stated and asks a decree of nullity, the result of which is to declare one whom he has sworn to love and cherish as a wife to be no more than a concubine, and her offspring, the fruit of the unlawful communion (born pending the suit), a bastard, must prove his case with the utmost strictness.   The same rule applies in such a case as on an indictment for bigamy.   The court in such cases is bound to act as the guardian of the helpless infant, and watch its rights and interests with jealous care.

I will consider, first, the sufficiency of the documentary proof of the first marriage.

The document offered for that purpose is a duly-exemplified copy of—to use the language of the clerk of the hustings court of the city of Richmond—" a marriage license now on file in the clerk's office of said court for the marriage of Arthur J. Rooney and Mary Tole, together with the minister's return thereon." The certificate of the clerk is dated June 19th, 1895.   How long such document had been so on file in his court does not in any wise appear.   The license appears to have been issued under the hand of " Ro. Howard, clerk " of the hustings court of Richmond, Virginia, May 2d, 1862.   On the same. paper is a statement of the names, ages and so forth of the husband and wife, also signed by the clerk.   Annexed, and on the same paper, is the minister's return of marriage, as follows :

" I certify, that on the 5th day of May, 1864, at Richmond City, I united in marriage the above-named and described parties, under authority of the annexed license.

"JOHN TEELING."

The person so signing does not state that he is a minister of the gospel or otherwise authorized to perform the marriage ceremony.

No evidence was offered of the laws of Virginia regulating the issue of marriage licenses or the filing of the certificates thereof, nor as to the value or effect as evidence of such certificates when filed.   I am not informed as. to what, if any, safe-

guards are thrown around such certificates by the laws of
Virginia in order to secure their genuineness and prevent fraud
and imposition. Nor does it appear that a copy of such certifi-
cate would be evidence in any court in Virginia; and if a copy
would not be evidence there, then, of course, it would not be
evidence here. For all that appears, the local laws may simply
provide for a safe depository of such documents for the benefit
of the parties, and that the originals only can be used as evi-
dence, upon due proof of their genuineness and of the character
of the person certifying to the ceremony. At best, under present
circumstances, all that the exemplification can be held to prove
is that there is on file in the office of the clerk of the court in
question a document in the words and figures certified to. The
requisitions of the federal constitution do not require us to go
further than that. Our own act (*P. L. of 1881 p. 210; Rev.
Sup. p. 288 § 8*), declares that

"any public records of any foreign state * * * or any copy thereof which
is admissible in such state to prove the facts therein contained shall be admitted
in evidence in the courts of this state" &c.

This language shows the necessity of the proof of the laws of
the foreign state, and it seems to me there should also be some
proof of the character and authority of the person performing
the ceremony.

It must be remembered that a mere certificate of marriage,
signed by a clergyman or magistrate, unattested by any oath,
and not signed by the contracting parties, cannot, upon any
recognized principle, and in the absence of any enabling statute,
be held to be evidence of the marriage. *Hubb. Suc. 247, 248,
257, 259*, where the cases to that date are collected; *1 Bish.
Mar., D. & S.* §§ *993, 998, 1003, 1011 (1891)*; *1 Whart. Ev.*
§§ *120, 657*. A different rule prevails as to entries on an official
register kept in pursuance of law. *1 Whart. Ev.* § *647 et seq.;
1 Bish. Mar., D. & S.* § *993*.

For these reasons I conclude that the paper in question has of
itself, for present purposes, no probative force or value.

This brings us to the other questions, which may be conven-

iently considered together, viz., Is the complainant worthy of sufficient credit as a witness to warrant finding the fact of the first marriage upon his unsupported testimony? And second, Has he, by his own conduct, debarred himself from the right to relief in this court?

The proofs present a most painful case. Complainant, sworn on his own behalf, says he was born April 1st, 1844; that he was married in 1862 (not 1864 as the certificate states) to Mary Tole, in Richmond, Virginia; that they lived together, off and on, until 1882; had one child, a son; that they separated in 1882, and have lived separate since 1883, under articles of separation, what purports to be a copy of which was produced; that he is an undertaker and embalmer by profession and gives lessons therein; that he met defendant in Albany, New York, as a pupil in the art of embalming; that he showed her a copy of the articles of separation from his wife, and told her that his wife was living. He says that he was firmly of the belief that the effect of the deed of separation was to give him the right to marry again; that he took no legal advice upon the subject, but simply talked the matter over with the defendant, and that both of them concluded that he was free to marry again during his first wife's life.

From his evidence, taken as a whole, it is plain that he induced the defendant to believe that he occupied the position of a divorced man freed from the obligations of his first marriage; and he has the audacity to come on the stand and swear that he actually so believed.

Now the evidence shows complainant to be a man of considerable education and intelligence and of wide experience. He pretends to have caused to be incorporated a national embalming college of which he, as "Professor Arthur Rooney," is demonstrator and treasurer. He is familiarly known as Professor Rooney, and as such lectures and gives lessons in the art of embalming. He made the defendant's acquaintance in the month of April, 1894, as a pupil, and lured her from her home in Troy, New York, to New York city by a letter in which he

proposed to start a monthly magazine called "The Embalmer," and employ her as an assistant editor of it.

The separation agreement itself gives no countenance whatever to the idea that it did or could free the parties from the bonds of matrimony. It was prepared, and its execution supervised, by counsel, and I infer from the evidence and the statements of counsel at the hearing that one of those counsel was acting under the retainer of the complainant. Now it is quite impossible to believe that either at the time the agreement was prepared, executed and signed, or at some subsequent period, the complainant did not ask the advice of counsel, or learn incidentally from counsel that he was still under the bonds of matrimony with his first wife. And if it were possible to believe that he did not ask the question of counsel, it is impossible to believe that a man of his experience and intelligence did not know, from reading the document, that it did not relieve him from the matrimonial bonds.

Upon these circumstances I look upon his evidence delivered in court on this subject as a cool, deliberate falsehood.

He says that shortly after he was married to the defendant he began to suspect that he was not at liberty to marry, coming to such belief, not by seeking the advice of counsel, but by casual talk with his friends; and, after satisfying his lust in the enjoyment of the person of the defendant for two months, with the result of pregnancy on her part, he entertained tardy but sincerely conscientious scruples as to the connection &c., sent her home to her friends in Troy, and brought this suit.

Further: The complainant is directly and seriously contradicted by a most reliable witness in the cause, to wit, the very respectable clergyman, Mr. Throop, of Jersey City, who performed the marriage ceremony. It appears that complainant called at Mr. Throop's house during the daytime on July 14th to make arrangements for the marriage in the evening, and saw his housekeeper; that it came out in the course of conversation that he was a divorced man, and undoubtedly it was so stated by him in order to ascertain in advance whether Mr. Throop would marry him as such, and that he was informed by the house-

keeper that Mr. Throop would not marry a divorced man; and that he then let the housekeeper get the idea that he was a widower, that his first wife was dead; but he denies in the most positive manner that he stated to Mr. Throop at the time of the ceremony that his first wife was dead.

Now, Mr. Throop swears that he began with the parties by asking the complainant the usual question, if it was his first marriage:

"I asked him if he were a widower, and he said he was, and there was a little something about the way that he replied that I didn't like, and so I made the question more definite; I said to him, 'You mean by that that your wife is dead,' and he replied, 'Yes, my wife is dead.'

"*Q.* Did he say to you that his wife was dead?

"*A.* He said to me that his wife was dead.

"*Q.* Are you positive of that?

"*A.* I am positive of it."

And the manner and bearing of the witness satisfy me that he could not be mistaken.

The result is that without taking into consideration the matters in which he is contradicted by the defendant, whose manner and bearing on the stand were such as to convince me that she was telling the truth, and without considering the manner of the complainant on the stand, which was not such as to inspire confidence in his reliability as a witness, I conclude that his evidence, standing alone, is insufficient to warrant this court in making a decree of the character here asked.

I might rest this part of the cause upon this result; but the other question, namely, whether complainant by his conduct has debarred himself of relief in this court, has been fully argued, and I think the parties are entitled to my views upon it, especially as the court of errors and appeals may differ with me upon the result of the proofs as to the former marriage.

This brings us to the evidence of the defendant.

At the time of the marriage she was twenty-eight years old, in humble circumstances, without parents, earning her living as an operative in a factory in the city of Troy, New York. In the month of April, 1894, she became one of a class to take les-

sons from Professor Rooney, at Albany, in the art of embalming, and thus made his acquaintance. He shortly afterwards called on her at her boarding-house in Troy two or three times, and sought her hand in marriage. He stated to her that he had been previously married, but was divorced from his wife and free to marry again; that he desired that the marriage should not be made public because it might affect his business. She declined him. Subsequently, in the month of June, 1894, she desired to make use of the knowledge of embalming she had acquired, as she supposed, from Professor Rooney, by engaging in the business in Troy, and for that purpose wrote to him at his New York address with the view to procuring the necessary outfit of implements and materials, with the result that the professor wrote her a letter dated July 6th, 1894, as follows:

" Public telephone and telegraph calls from the trade for embalming answered promptly at our expense.

"NATIONAL EMBALMING COLLEGE.
" (Incorporated.)

"P. W. LEVERING,                    PROF. ARTHUR ROONEY,
" *Chemist and Secretary.*          *Demonstrator and Treas.*

"Manufacturers of Standard Embalming Fluids and Specialties, Guaranteed for Arterial and Cavity Preservation.

"10 Bond street.                    NEW YORK, July 6th, 1894.

" *Miss Helen F. Barry*—Please allow me a few words by this means to clear up any misunderstanding which may be between us. In consideration of the disagreement we had when I left Troy last. I sent a letter to Mr. Balmer stating my views concerning what I would do if you desired to take the management of 'The Embalmer.' I addressed my communication to him as my promise was out to him concerning the management of 'The Embalmer.' I gave him my idea why it would not be clear for him to manage it as he was to be our ag't at Troy, and said I thought you could *manage* it. I have had no reply from him yet. 'The Embalmer' must come out this month or first part of next. It takes some time to get a correct Monthly Magazine ready for the public, particularly the first number of its revival. It is necessary for me to know what foundation to build on. I cannot commence the enterprise before some good plan is settled. Will you be kind enough to give me your views. I believe you can make it pay you handsomely in the near future. If you take advice from your Best Friend, which I believe I am and intend to continue till the end of time.

" Truly Yours,
"ARTHUR ROONEY.

Rooney v. Rooney.

"P. S.—I have gotten out the tenants at No. 10 Bond St. I intend to concentrate all business and manufacturing at Jersey City, N. J., except an office in New York City which will do for 'The Embalmer' office also if desirable or I will establish 'The Embalmer' office at Albany or Troy if it will be better.
"Tell me what you think about it.

"Resp.,
"A. R.

"Our charter requires principal office Jersey City. Business office in any other state or states."

She came to New York on the day boat, on the 11th or 12th of July, for the purpose, as she says, of procuring the outfit, notifying the professor the boat she would take. He met her by boarding the boat at Yonkers, and took her to a room which he had provided for her in New York. He then solicited her to marry him, and she finally consented to do so. Throughout, he stated to her that he was divorced from his former wife and entirely free to marry. He swears that he showed her a copy of the agreement of separation between him and his wife, and explained that he derived his right to marry from it, and denies that he said he was divorced. This she denies in the most positive manner, and says that she never saw the separation agreement until it was shown to her on the witness-stand. In this I fully believe her. But I stop to say that it makes little difference whether she saw it or not, since it abundantly appears from complainant's own evidence that he stated to her and assured her that he was free to marry—she says by divorce; he says, as the result of these articles of separation; and if his version of the affair in that respect is the true one, he still remains a frauddoer, for he is, as I have already observed, a man of intelligence and experience, and could not for a moment have believed that such was the effect of the agreement, while she was an ignorant, inexperienced, simple person who might well believe his assertion in that regard. When pressed, he hardly ventured to swear that he actually handed her the document in question, but says that he placed his trunk, which was unlocked, in the room to which he took her in New York, and that it contained all his papers, and that she looked them all through. Her version of the affair is that there was no such trunk in her room, and that

she did not see the separation agreement, but that he showed her a mass of papers, among others a certificate of incorporation of the embalming college, and certificates of stock issued thereunder, and a lot of printed matter in connection therewith and with the embalming college and the proposed magazine; and that those are the papers which he had talked to her about previously in Troy, and which were in keeping with the proposition contained in his letter of July 6th. And these account for an expression in a letter written by her on July 17th, three days after her marriage, to a female friend in Albany, which the complainant succeeded in procuring and putting in evidence, in which she uses this language: " I have examined all papers and find everything as the professor represented." That letter announced their marriage, and authorized her friend to say that she was married, and she would rather that she would tell it; that the professor had no objections; and states that she had written to two other friends by the same mail.

The parties lived together for a little less than a fortnight after the marriage, when the defendant made a short visit to her friends in Troy, and then they resumed cohabitation some time early in August, and lived together till about the middle of September, when they separated. The complainant says the cause of separation was that the defendant made an unfounded criminal charge against him. Her account of it is that when he discovered that she was with child he attempted to produce an abortion upon her, of which act she complained to a police magistrate, and that soon afterward, the cohabitation still continuing, he left her in the night while asleep, opened the gas burners in her bedroom, closed the door on her and was about leaving the premises when she awoke in time to save her life.

An attempt is made to impeach the evidence of the defendant by a Mrs. M., who claimed to be in the employ of the complainant in his business of an embalmer. It is not necessary to detail this evidence, but it is sufficient to say that the attempt to impeach the defendant failed and reacted upon the witness.

The question is whether the fraudulent conduct of the complainant debars him from suit in this court.

Rooney v. Rooney.

If this were an ordinary suit in equity to set aside or annul an ordinary contract, there could, of course, be but one answer to the question. The maxim, he who comes into equity must come with clean hands, would apply, since the fraud here practiced by complainant was connected with the procurement of the very contract that he now seeks to have declared null. *1 Pom. Eq. Jr.* §§ *397, 401.*

Now, it is to be observed at the start that this court is not asked here to decree a divorce by dissolving an existing valid contract, thereby altering the relations of the parties, but simply to judicially declare, and no more, just what their relations are and have at all times been. For it is well settled that a ceremony of marriage between parties, one of whom has a lawful husband or wife living from whom he or she has not been lawfully divorced, is absolutely void *ab initio*, and has no binding effect for any purpose whatever, and may be so treated at all times, in all places, and for all purposes, and that a decree of a court declaring it null is not necessary for any purpose. This is the law of the land, quite independent of the statutory declarations upon that subject. The value of the decree of nullity is that it works an estoppel, and prevents the question of fact out of which the nullity arises from being again brought in question. Such a decree cannot be properly called a decree of " divorce," since that word implies a dissolution of, and does by its terms dissolve, a prior valid existing contract.

The use in our act of the word " divorce," as applied to a decree of nullity in such a case, is plainly a misnomer.

Again, it is clear that the present suit is one of an equitable nature of which this court has jurisdiction quite independent of the statute. *McClurg* v. *Terry, 6 C. E. Gr. 225,* and cases cited ; *Anonymous, 9 C. E. Gr. 19 ; Carris* v. *Carris, 9 C. E. Gr. 516,* and cases cited ; *2 Bish. Mar., D. & S.* §§ *801, 808.*

In the well-considered case of *Tefft* v. *Tefft, 35 Ind. 45,* a suit was brought by a husband for a divorce from his wife on the ground that she had a husband living at the date of the marriage, and it was held—there being at that time no statute on the subject in Indiana—that he was entitled to a decree of

nullity under the general power of the court, provided, and not otherwise, that it affirmatively appeared that he did not know of the defendant's incapacity when he married her.   Accordingly, a count in the bill which omitted to allege that the plaintiff did not know that the defendant had a husband living at the marriage in question was held bad ; and one alleging such ignorance was held good on demurrer.

In *Fuller* v. *Fuller, 33 Kan. 582*, it was held that where a man *innocently* marries a woman who has a husband living, he may afterwards maintain an action against her in equity to have a supposed and colorable marriage declared a nullity.   The opinion states that while the court has power to declare that the marriage was a nullity *ab initio*, by virtue of its equity powers, yet the legislature had, from prudential reasons (a remark that applies to our legislature) given a remedy to an *innocent* party to such a marriage by an ordinary suit for divorce.   This indicates that the Kansas legislation is similar to ours, except that it expressly limits the remedy in cases of prior marriage to *innocent* parties. And such is the provision of the Pennsylvania statute, on the same subject.   *Act of March 13th, 1815, 1 Bright. Purd.*

There is authority for the proposition that suits for divorce in this court, based upon purely statutory grounds, are of an equitable nature and subject to the rules and maxims of courts of equity rather than those of the English ecclesiastical courts.   It is evident that Chancellor Zabriskie was of that opinion from what he said in *Derby* v. *Derby, 6 C. E. Gr. 39,* and the language of Vice-Chancellor Van Fleet, in *Woodward* v. *Woodward, 14 Stew. Eq. 224,* is in the same direction.   The very fact that the legislature gave the power in such cases to this court rather than to the courts of law, encourages that view.

The equitable nature of the suit being established, and it being brought in a court of equity, it seems to me that it should be dealt with upon the same equitable principles as other suits founded upon ordinary equities.   Mr. Bishop states the general rule to be that a party who by fraud has induced another to enter into the contract of marriage cannot be permitted to maintain a suit to avoid it ; and this rule applies to all merely void-

able marriages. But he makes a distinction between suits to annul voidable marriages and suits to procure a declaration of nullity *ab initio* by reason of precontract, and as to the latter asserts the rule to be that fraud on the part of the plaintiff is no defence. *1 Bish. Mar., D. & S.* § *722; 1 Bish. Mar. & D. (4th ed.)* § *300.* I have examined most of the cases cited by him in favor of this proposition. The American authorities do not support it. *Tefft* v. *Tefft* and *Fuller* v. *Fuller, supra,* are against it. In *Summerlin* v. *Livingston, 15 La. Ann. 519,* the action was by the representatives of the deceased wife against her husband to obtain her share of the joint property under the community laws of Louisiana. The husband defended on the ground that the marriage was a nullity by reason of the prior marriage of the wife. In delivering judgment, the court said : " If it is true that the defendant was aware at the time of his marriage of the incapacity of his wife to marry, his course in marrying her was highly immoral and reprehensible. The record does not give information on this subject. But, at all events, *although the party could not avail himself of his own turpitude as a basis of demand,* yet he is not estopped when he sets it up as a defence."

I think the weight and tendency of American authority are against affording affirmative relief to a person situate as the complainant is here.

The English authorities are the other way. The leader is *Miles* v. *Chilton, 1 Rob. Ecc. 684.* That was a suit for nullity by husband against his wife, based upon her prior marriage to a husband still living. The question arose upon a motion before Doctor Lushington, on behalf of the wife, to amend her pleading by adding an allegation that the libellant had induced her to marry him by false and fraudulent representations, viz., that a suit for divorce instituted against her by her first real and lawful husband had been prosecuted to a decree divorcing the parties from the bonds of matrimony, by which she was freed therefrom and at liberty to marry again. This was impossible, as I suppose, at that time (1847), as only an act of parliament could then produce that result. Doctor Lushington, however, refused

to permit the amendment, upon the broad ground that the husband's fraud did not debar him from relief.

This decision was treated as authority by Mr. Justice Butt, in 1888, sitting in the probate divorce division of the English court, in *Andrews* v. *Ross, 14 Pro. Div. 15.* That was a suit by a wife against a husband for a declaration of nullity by reason of her being the sister of his first wife, who had died prior to the second marriage. The petitioner knew of the first marriage with her sister. The learned judge said: "In that state of things, and *in accordance with all the principles of law administered in other courts*, she would not be allowed to sue for a declaration of nullity of marriage." But he held that the settled law of the ecclesiastical courts of England was as it had been laid down in *Miles* v. *Chilton*, and that the statute of 1857, erecting the new court of probate and divorce, bound him to follow the law of its predecessor. It is worthy of observation here that in that case there was no fraud practiced by the wife upon the husband, but it was merely a case of mutual knowledge that the act that they were committing was unlawful. It is also proper here to remark that the English chancellors declined to exercise jurisdiction in such causes, not because chancery had no jurisdiction of them, but because the ecclesiastical courts had, and exercised, full jurisdiction. *Carris* v. *Carris, supra.*

The question now presented is, Should this court, in a case like the present, follow the general rules governing courts of equity, or those peculiar rules which obtain in the English ecclesiastical courts as displayed in *Miles* v. *Chilton?* It seems to me that the answer would be clearly in favor of the application of general equity rules were it not for the language of our statute. The second section declares that "divorce from the bonds of matrimony *shall* be decreed where either of the parties had another wife or husband living" &c. I have already remarked upon the improper use of the word "divorce" in this section, and the question is, is the word "shall" in that sentence peremptory and mandatory, or merely directory, leaving the court while administering justice in such causes still a court of equity, requiring its suitors to come into it with clean hands.

Upon the best consideration I can give the question, I conclude that the legislature did not intend, *pro hac vice*, to essentially change the intrinsic character of this court, nor to compel it to violate its fundamental principles in order to reach a result which shocks the conscience of all persons of right feeling.

Admitting, then, that I am mistaken in my conclusion that there is in this case no reliable evidence of the former marriage upon which a decree can be founded, I still feel bound to advise against complainant's prayer for relief.

This brings me to the defendant's cross-bill and prayer for affirmative relief under the twentieth section of the Divorce act.

There can be no doubt under the evidence that the complainant did abandon the defendant and refuse to provide for her in such manner and to such extent as to bring the case within the provisions of that section. The commencement and prosecution of this suit, accompanied by a stoppage of all provision for her support, until compelled thereto by the court pending suit, was, of itself, such abandonment.

The only question is whether the reversal of the position of the parties, by which the defendant becomes actor and the complainant defendant, will, under the peculiar circumstances of this case, bar defendant's claim.

The only evidence, other than that already noticed, which bears upon this issue, is that of Walter Rowley, the complainant's nephew, who swears that when he was a boy, from six to eight years old, he lived in Richmond, Virginia, and recollects visiting complainant and his alleged wife, and that they were then living together as husband and wife in Richmond. I did not deem this evidence of any importance upon the first issue, because I concluded that to sustain that issue complainant must prove an actual valid marriage; that mere cohabitation as man and wife was insufficient. Moreover, the evidence of the witness was meagre and unsatisfactory, and his manner and surroundings were not assuring.

The ceremony of the marriage between the parties to this record is admitted and clearly proven, and every reasonable presumption should be made in favor of its validity and against its

nullity. The burden of proving its nullity is properly cast upon the complainant, who asserts his own former marriage. *Patterson* v. *Gaines, 6 How. 550.* Whether it be set up as a cause of action, or as a defence, in either case it seems to me it should be clearly proven. I think that the evidence of cohabitation by Rowley is insufficient to cover the defects pointed out in the proofs adduced by complainant to make out his case on his bill. It was so easy for the complainant to make complete and satisfactory proof of the vital fact in question that his failure so to do excites suspicion.

For these reasons, and laying out of view any notion of complainant being estopped by his conduct from denying, *pro hac vice,* the validity of his marriage with the defendant, and in full view of the rule laid down by Chancellor Vroom in *Zule* v. *Zule, Sax. 96,* I conclude that defendant is entitled to relief on her cross-bill.

I have dealt with this part of the case as if complainant had specially set up in his replication, by way of answer to the defendant's cross-bill, the former marriage as a defence. This he failed to do, and it is doubtful if he is entitled to avail himself of that defence to the cross-bill without specially pleading it. And the tendency of the authorities is decidedly against relieving a party situate as is the complainant from a slip of that kind. *2 Bish. Mar. & D.* § *294; 2 Bish. Mar., D. & S.* § *799; Nokes* v. *Milward, 2 Add. Ecc. 386.*

I will advise a decree that the complainant's bill be dismissed, and a decree for the defendant upon her cross-bill for alimony, and will hear counsel (and further evidence if necessary) as to the amount to be allowed. The defendant is entitled to costs.