On April 26th, 1927, Joseph Capraro, late of Middlesex county, was killed in an accident with the Lehigh Valley Railroad Company. On May 5th, 1927, the defendant Isabella Capraro, claiming to be his wife, through a ceremonial marriage with him, in the city of New York, on November 21st, 1907, obtained letters of administration upon his estate from the Middlesex county surrogate. As a consequence of his death, she effected a settlement of damages in the sum of $5,000 with the railroad company. Joseph and Isabella, as a result of their alleged marriage, had two children, the defendants John and Mary.
The complainant, Rosa Lanza Capraro, a resident of Italy, through Riccardo Riccardi, her attorney in fact, claims to be the true and lawful widow of Joseph. She instituted proceedings in the Middlesex county orphans court to compel the defendant Isabella to account for the moneys received as aforesaid.
On December 20th, 1932, the orphans court of Middlesex county, signed a decree, whereby it was ordered, adjudged and decreed that the sum of $4,244.16 remain in the hands of Isabella Capraro as administratrix of the estate of Joseph Capraro, deceased. On the same day, the said court directed distribution of the funds. From this order directing a distribution, an appeal to the prerogative court was taken. On August 27th, 1934, that court reversed the decree of December 20th, 1932, of the orphans court. It held that the orphans court lacked jurisdiction to order distribution of funds arising under the Death act. See In reCapraro, 116 N.J. Eq. 259; 172 Atl. Rep. 907.
That decree was appealed from; but the court of errors and appeals, on October 9th, 1935, affirmed the decree of the prerogative court. 119 N.J. Eq. 82; 180 Atl. Rep. 830.
On April 18th, 1935, the complainant instituted an action of ejectment in the Middlesex county circuit court against all *Page 69 
the defendants. On October 19th, 1938, a judgment for ejectment in favor of the complainant was directed by the judge of the Middlesex county circuit court against these defendants; but on November 18th, 1938, it was set aside and a new trial granted.
The complaint herein was filed on December 13th, 1938. It alleges two causes of action. In the first cause, the complainant contends that, as the lawful widow of Joseph Capraro, she is entitled to the said sum of $4,244.16 remaining in the hands of the defendant Isabella Capraro. In her second cause of action, she contends that she is entitled to possession of the real estate of which Joseph died seized.
The proofs disclose that the complainant and the decedent were married in the town of Terranova, Italy, on February 6th, 1902. They both were born in that town, and resided there at the time of their marriage. A certificate of their marriage was offered and received in evidence (Exhibit C-5). Two witnesses, Riccardo and Frank Riccardi, testified they were present at the civil and religious marriage ceremonies between Rosa and Guiseppe, the said decedent. The first took place in the municipal building in Terranova; while the latter was performed in the local church in the same town. They said a marriage celebration followed at the home of the complainant, which they attended; and that among those present was the defendant, Isabella Capraro, who was then known as Isabella Propati. Frank Riccardi stated he then and there danced with Isabella.
Guiseppe was also known as Joseph. He and his wife, Rosa, after their marriage, went to live with his parents on a farm on the outskirts of the town of Terranova, where they both resided together for about one year. Then Guiseppe left Terranova and departed for the city of New York. His wife remained at his parent's farm.
Isabella admits that she was born in the town of Terranova, Italy, and lived there until she came to America in 1907. She denied that she knew the complainant in Italy, and that she attended the said marriage celebration, and there danced with Riccardi. When she came to America, Isabella took up her residence in New York City in the same house on One *Page 70 
Hundred and Fifteenth street where Guiseppe was then living.
The complainant's witness, Frank Riccardi, left Terranova shortly after Isabella's departure from Italy, and came to America. He then took up his residence in New York City, in the same house on One Hundred and Fifteenth street where Guiseppe and Isabella were then living. Frank said that Guiseppe, also known as Joseph Capraro, was the same man whose marriage to the complainant he witnessed; and that the defendant Isabella is the same person with whom he danced at the marriage celebration in Terranova, Italy, in 1902. He further said that Guiseppe Capraro and the defendant Isabella, in April, 1927, resided in South Plainfield, New Jersey. The evidence discloses that they resided together in that place since 1919.
Riccardo Riccardi left the town of Terranova in the year 1911, came to the city of New York, and went to live at the aforesaid house on One Hundred and Fifteenth street. He said that Guiseppe Capraro was then living in the same house; that he knew Guiseppe to be the same man who married Rosa Lanza in Terranova, Italy. He testified that after he arrived in New York City, Guiseppe asked him if Rosa were still alive and living with his parents in Terranova.
On behalf of the defendant, a certificate of her marriage to Guiseppe Capraro was offered and received in evidence (ExhibitD-2). It discloses that the decedent, Joseph Capraro, said, in answer to a question if he were "single, widowed, or divorced," that he was "single."
Interrogatories were propounded to the complainant in Italy, which were offered in evidence. Among them the following questions and answers appear:
"Q. 6. Have you ever been divorced from Guiseppe Capraro, A. 6. No. Q. 7. Do you know of any suit commenced by your husband, Guiseppe Capraro, for divorce, A. 7. No."
I am satisfied that the complainant, Rosa Lanza Capraro, and the decedent, Guiseppe, known also as Joseph Capraro, were legally competent to, and did, marry each other on February 6th, 1902. It is my belief that the alleged marriage between the defendant Isabella Capraro, and the said Joseph *Page 71 
Capraro, deceased, on November 21st, 1907, was bigamous, illegal and void ab initio. Friesner v. Symonds, 46 N.J. Eq. 521;20 Atl. Rep. 257.
The defendants contend that the complainant's cause of action against Isabella Capraro is barred by the statute of limitations; and they further urge that she is guilty of laches. The defendants refer to section 2:24-1 of the Revised Statutes of 1937, which enumerates certain causes of action which must be instituted within six years. That section, I find, is no bar to a cause of action instituted by a person who is entitled to a distributive share of funds recovered under the Death act. While it enumerates several kinds of actions for which suit must be instituted within the statutory time, it does not mention among them an action for a distributive share of funds recovered under the provisions of the Death act. Hedges v. Norris, 32 N.J. Eq. 192.
The Death act, chapter 47, R.S. 1937, 2:47-4, mentions those who are entitled to money that may be recovered and it provides for the manner of its distribution. It nowhere provides within what time after the money is received that the general administrator must make distribution; nor does it say that if the general administrator fails to make distribution, within what time thereafter the interested parties have within which to sue; or in what court such suit must be brought. The only limitation of action under the Death act is under section 2:47-3 which relates to the time of the commencement of an action for damages for the decedent's death.
In the instant case, as above related, the administratrix of the decedent's estate settled the estate's claim for damages.
The complainant's activities, as well as the facts and circumstances in the present situation do not sustain the defendants' allegation that the complainant has been guilty of laches. On the contrary, she has been actively engaged in litigation, with the defendants, upon the varied points involved herein, since the latter part of 1930. To sustain their contention that the statute of limitations applies to this case, the defendants cite the cases of Conover's Executors v.Conover, 1 N.J. Eq. 403; Cowart v. Perrine, 18 N.J. Eq. 454, *Page 72 
and Somerset Bank v. Veghte, 42 N.J. Eq. 39; 6 Atl. Rep. 278.
Those cases did not, as here, involve funds which, in effect, are held in trust; they specifically exempt such cases. They also direct attention to the case of Partrick v. Groves, 115 N.J. Eq. 208; 169 Atl. Rep. 701, as approving Somerset Bank v.Veghte, supra. In its opinion in that case, the court of errors and appeals, among other things, said:
"Courts of equity ordinarily act in obedience and in analogy to the statute of limitations, but they will not allow the bar of that statute to prevail where it would manifest injustice."
And "The court can always shape its remedy so as to meet the demands of justice in every case however peculiar. 2 Pom. Eq.Jur. (4th ed.) § 910."
See, also, Levy v. D'Alesandro, 14 N.J. Mis. R. 449;185 Atl. Rep. 543.
The defendant Isabella Capraro, as general administratrix of the estate of Joseph Capraro, deceased, retains the funds she received in the settlement of the death action as trustee for the benefit of those persons entitled to take pursuant to section 2:47-4 of the Revised Statutes of 1937.
It may be noted that in his prerogative court opinion (116 N.J. Eq. 259; 172 Atl. Rep. 907) Vice-Ordinary Backes in reversing the orphans court for the reason that it had no jurisdiction to order distribution, held:
"The power to settle the account did not carry with it the power to order distribution of fund. That was a duty imposed by the statute upon the administrator, not upon the court, and a determination by the orphans court would not protect the administrator, nor bind the claimants. For his protection or for the ascertainment of their rights they must pursue the remedies provided by law, as in other matters of trust."
The defendants say, although it be assumed that Joseph's marriage to Isabella were bigamous and void, nevertheless, their children, John and Mary, are legitimate. To sustain them, they point to chapter 15, section 9:15-2 of Revised Statutes of 1937, which reads as follows:
"Children of Void Ceremonial Marriages: Any child heretofore or hereafter born of a ceremonial marriage is the legitimate child of both *Page 73 
parents, notwithstanding the marriage be thereafter annulled or declared void. Such child shall enjoy the status and rights to which he would be entitled had he been born of a valid marriage."
They argue that since Joseph went through a ceremonial ritual with Isabella, such ceremonial ritual, ipso facto legitimatized the two children despite the fact they were both born of a bigamous marriage. I do not accept their conclusions as being sound; nor do I believe that the legislature in enacting the statute ever had in mind a situation as here confronts us. The ceremonial ritual between Joseph and Isabella could not, and certainly did not, effect a union of husband and wife between them. In Rooney v. Rooney, 54 N.J. Eq. 231; 34 Atl. Rep. 682,
the court held:
"It is well settled that a ceremony of marriage between parties, one of whom has a lawful husband or wife living, from whom he or she has not been lawfully divorced, is void abinitio, and has no binding effect for any purpose whatever and may be so treated at all times in all places and for all purposes, and that a decree of court declaring it null is not necessary for any purpose."
I believe that section 9:15-2 relates to parties to a marriage who, under a color of right, entered into such a contract, but subsequently, because of some impediment, was annulled and declared void by judicial decree. I do not believe that the statutory provision was ever intended to apply to bigamous marriages, where both parties were conscious of a matrimonial impediment. In the instant case, there was no decree of annulment, or dissolution of the alleged marriage between Joseph and the defendant Isabella. Those two persons were not unmindful of wrongdoing when they entered into their bigamous marriage; it was not an innocent act on their part. They defied the laws of God and man in going through a form of marriage ceremony. Aware of their moral and legal disability to conclude a marriage contract, their marital pretensions were just a convenient screen to hide from society a deliberate matrimonial fraud. Section 9:15-2 of the Revised Statutes of 1937, I believe, was planned to protect the offspring of a marriage entered into in good faith, through apparent honest motives, which the parties believed to be *Page 74 
valid, and it was not meant to legitimatize the offspring of a designedly bigamous relationship.
Chapter 15 of the Revised Statutes of 1937, section 9:15-1, dealing with the legitimatization of illegitimate children, provides that any child heretofore or hereafter born out of wedlock shall be legitimate by the intermarriage of his natural parents and their recognition and treatment of him as their child; and grants to such child all the rights and privileges which he would have enjoyed had he been born after the marriage. That act, of course, has no application to this case since the facts, concededly, are different.
In Price v. Sainsot, 103 N.J. Eq. 355; 137 Atl. Rep. 545,
Mr. Justice Parker, speaking for the court of errors and appeals, referring to section 9:15-1 on the legitimate, or illegitimate, status of children, said: "If both were then legally free to marry, this gave the child a legitimate status." Joseph and Isabella were not free to marry after Joseph became the husband of the complainant.
In 7 Am. Juris. 666 § 58, it is stated:
"A statute providing that a child born before wedlock shall be made legitimate by the subsequent marriage of its parents presupposes a valid marriage, and it does not apply to a child whose father had not, at the time of the marriage, obtained a valid divorce from his former wife.
"The statute relates only to such marriages between parents as may be lawfully made and not to those which are polygamous, incestuous or prohibited by law." 216 U.S. 386.
 7 Am. Juris. 631 § 7:
"It has been held, however, that a statute providing that the marriages of persons unable to contract or unwilling to contract are void and that the issue of such marriages, before they are annulled and declared void by a competent court, are legitimate does not include a bigamous marriage or the issue thereof for the reason that a mere marriage ceremony between a man and a woman where one of them has a living wife or husband, is not a marriage at all, but is a mere empty ceremony, and affects nothing and creates no status between the parties."
Also Irving v. Irving, 18 A.L.R. 88.
Under the Death act, chapter 47, Revised Statutes of 1937, section 2:47-2, it is provided that the suit be instituted by *Page 75 
the administrator ad prosequendum of the deceased. By section 2:47-4 it designates who is entitled to the money recovered and in what proportion. The act states that the amounts recovered shall be for the exclusive benefit of the widow, surviving husband, and next of kin of the decedent and shall be distributed to them in the proportion provided by law for the distribution of the personal property of intestate, except that where decedent leaves a surviving widow or husband, but no children or descendant of any children and no parents, the widow or surviving husband shall be entitled to the whole amount so recovered. Section 2:47-5 of the act provides that in every action brought under the provisions of the act, the jury may give such damages as they shall deem fair and just with reference to the pecuniary injuries resulting from such death to the widow, surviving husband, and next of kin of the deceased. But this section 2:47-5 is not involved in the present case, because the suit against the railroad has been settled by the administratrix ad prosequendum
and the proceeds thereof paid to the general administratrix, so that the question of pecuniary loss is not an issue. The issue is: Who is entitled to the funds? Section 2:47-6 of the act provides that after settlement is made or judgment is recovered by the administrator ad prosequendum, the money is to be paid to the general administrator of the estate of the decedent who shall make the distribution to the proper parties.
The legislature has not stated that if the surviving husband or widow commits a matrimonial offense, it shall prevent him or her from taking a distributive share under the act. The defendants contend that the complainant violated her marriage vows and was guilty of adultery with one Giovanni Luphrano. The evidence upon which that allegation is based is the testimony of Angelo Goio, a witness of the defendants. His testimony was founded on rumor and hearsay obtained by him when he was of the approximate age of fourteen years, and is wholly lacking in probative force.
The English rule for the recovery of funds under the Death act, known as Lord Campbell's act, cited by the defendants, makes provision for each named beneficiary, who is regarded as having a separate, independent interest, and the executor *Page 76 
or administrator brings the action in the name of the beneficiary for his or her portion and the jury makes the apportionment on the basis of compensation dependent upon the relation of dependents and of the beneficiary in the life of the deceased. The distinction between the English rule and that prevailing in New Jersey is pointed out in 16 Am. Juris. 177 § 258, where it is said that "Under Lord Campbell's act the apportionment is made by the jury." Then as to the statute as exists in this state, it says:
"The personal representative of a decedent in whose name an action for wrongful death is brought, is a trustee for the beneficiary and it is his duty to distribute the damages recovered or received in accordance with the provisions of the statute for a breach of which duty the representatives are liable to the beneficiaries affected."
In Coile v. Mayne, 122 Fed. Rep. 836, it was held:
"It was true that the Queen's Bench in Stimson v. Wood, 59N.S. Law Term Report 218, held under Lord Campbell's act in an action brought for his death that she could not recover where at the time of the husband's death she was living apart from him and in open adultery with another."
It, therefore, follows that where the first in right under the statute is living, no misconduct of such person will constitute a disqualification to maintain the action unless imposed by the legislature which gives the right. Certainly, the court is without power to enlarge or restrict the language of the statute.
In Gottlieb v. North Jersey Street Railway Co.,72 N.J. Law 480; 63 Atl. Rep. 339, the court said:
"The fund recovered in an action under that statute is no part of the estate of the deceased wife. It is a fund arising out of a judgment in an action given by the statute for the benefit of specific persons, and which action, as Mr. Justice Depue expressed it `enures to such persons as a vested right.' The proceeds of the action enures, also, to the benefit of the persons named in the statute, and to them alone. The fund recovered is not to be distributed, under the statute of distributions, as if a part of the intestate's estate, in the manner pointed out by that statute, but is to be apportioned solely *Page 77 
among the beneficiaries named in the act of March 3d 1848, in the method provided by the statute of distributions; that is, the fund received is to be distributed, by the administrator trustee receiving it, to the beneficiaries named in the act of March 3d 1848, who are alone entitled to receive it. This distribution is to be made in the same manner as the administrator would be required to distribute the fund if it were a part of the intestate's estate, and the persons named in the act of March 3d 1848, were the only persons legally entitled to share in the distribution under the statute of distributions."
See, also, Wilson v. Wilson, 120 N.J. Eq. 216;184 Atl. Rep. 523. In Stagg v. McCann, 95 N.J. Eq. 53; 122 Atl. Rep. 305;affirmed, 96 N.J. Eq. 327; 125 Atl. Rep. 240, the court said:
"I am not unmindful of the force of counsel's contention in favor of the natural equity of the parents — whose pecuniary support from the decedent is cut off by his death to participate in the distribution of any fund recovered from the party held to be responsible therefor; but, however unsatisfactory in that respect the method of distribution provided by the statute may be, the remedy for such a situation which is in clear derogation of the common law rule, should be provided by the legislature and not by any unwarranted interpretation or construction of the existing legislative enactment."
Also Murphy v. Duluth Superior Bus Co. (Minn.),274 N.W. Rep. 515; Gaydos v. Domabayl, 301 Pa. 523; 152 Atl. Rep. 549.
Chapter 39, section 3:39-2 of the Revised States of 1937, provides:
"Bar by adultery. If a married person voluntarily leaves his or her spouse and goes away and continues with his or her paramour, such person shall be forever barred from having jointure, dower or curtesy, as the case may be, unless the deserted spouse voluntarily becomes reconciled to and lives with the deserting spouse, in which case jointure, dower or curtesy shall be restored."
The only suggestion of adultery by the complainant is the hearsay evidence given by the defendants' witness, Angelo Goio, above referred to. However, the evidence is clear that *Page 78 
Joseph Capraro left the complainant in Italy and came here to America to live, and on November 21st, 1907, without color of right, went through a civil marriage ceremony with the defendant Isabella.
In Morello v. Cantalupo, 91 N.J. Eq. 415;111 Atl. Rep. 256, the court said:
"The prevailing rule in this country is stated in Scrib. Dow531, and in 14 Cyc. 933, to be that under the statutes of the states which have adopted adulterous elopement as a bar, two things must combine to constitute the bar: The departure of the wife must be voluntary on her part and she must continue with the adulterer. So that where the wife's desertion was caused by the cruelty or neglect of her husband her subsequent adultery will not constitute a bar."
It does not seem necessary to state that chancery has the power to compel the defendant Isabella to account and pay over the said sums to the complainant, the beneficiary of the estate. Frey v.Demarest, 16 N.J. Eq. 236.
This court will retain jurisdiction over the second cause of action. The adjudication in the first cause of action is dispositive of the second cause of action.
I shall advise a decree granting the relief sought by the bill.