## CATHARINE E. BOWMAN vs. CHARLES A. LITTLE ET AL., ADMINISTRATORS, AND LETTIE E. BOWMAN.

*Presumptions of Marriage and Legitimacy—Strict Proof Required of Antecedent Marriage When it Invalidates Subsequent Formal Marriage—Sufficiency of Evidence—Declarations—Marriage Certificate—Proof of Identity—Harmless Errors.*

The question whether a formal marriage is valid or not cannot be tried like any other question of fact which is independent of presumptions, for the law will presume in favor of marriage, and this presumption must be met with distinct and satisfactory disproof.

When it is proved that a man was married to a certain woman by a legal ceremony and had issue, and another woman claims that the man had previously been married to her, there must be strict proof of the alleged antecedent marriage as an actual fact, because the presumptions of law are in favor of innocence and legitimacy.

After the death of one G. Walter Bowman of Hagerstown, Md., in 1903, leaving a widow, to whom he had been married by a legal ceremony, and a child, another woman, the plaintiff, alleged that she was the lawful widow of Bowman and claimed a share of his estate.. To establish her marriage she offered the certificate of a clergyman in Camden, New Jersey, setting forth that in 1887 he had married one George W. Bowman of Haleystown, Md., to one Catharine McGranagan, alleged to be the plaintiff; also the testimony of plaintiff's mother that Bowman had told her that he had married her daughter; that she had visited them for a few days when they were living at a certain house; and also the testimony of a physician that when employed to attend the plaintiff Bowman had stated that she was his wife. *Held*, that since there is no evidence that the deceased Bowman was the identical person who was married in Camden and that the plaintiff was the woman who was then married, this evidence is legally insufficient to rebut the presumptions that Bowman did not commit bigamy and that his issue is legitimate and to established by strict proof the fact of the alleged antecedent marriage.

A marriage certificate is not in itself proof that certain parties were married but there must be also evidence that they were the identical parties the question of whose marriage is at issue. Identity cannot be proved by the admissions of one of the parties in a case where it is necessary to rebut the presumptions of innocence and legitimacy.

The fact that a man said that the woman with whom he was cohabiting was his wife is not sufficient evidence to prove a marriage, when he was subsequently formally married to another woman.

The plaintiff in this case alleged in a suit against an administrator that she had been married to the decedent *Held*, that the plaintiff is not a competent witness to prove the marriage, either directly or indirectly, under Code, Art. 35, sec. 3, which provides that in proceedings by or against administrators, etc., no party to the cause shall be allowed to testify as to any transaction had with the deceased.

When it is sought to prove that a man and a woman were married by a formal ceremony at a certain time and place, evidence that these parties were reputed to be married is not admissible.

The rejection of prayers offered by the plaintiff that were correct, or the admission of incompetent evidence, is not reversible error when upon the whole case it is proper to instruct the jury that the plaintiff's evidence is legally insufficient to authorize a recovery.

Appeal from the Circuit Court for Carroll County (JONES, C. J., and THOMAS, J.)

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, BOYD, PEARCE and SCHMUCKER, JJ.

*J. Clarence Lane* and *Francis Neal Parke* (with whom was *Jas. A. C. Bond* on the brief), for the appellant.

Identity may be proved from facts and circumstances, and declarations of a dead husband are admissible for that purpose. The appellant's case rested upon proof of a ceremonial marriage. The officiating clergyman was dead, the appellant was incompetent to testify as to the marriage ceremony, and the only witness present could recall nothing about this particular marriage because of the number she had witnessed.

The appellant was therefore compelled to show by facts and circumstances the *identity* of herself and George Walter Bowman with the persons named in the marriage certificate offered by her in evidence. In order to do this, a nephew of Bowman was offered to prove that after 1890 George Walter Bowman looked at a picture belonging to witness and asked the name of the person it represented. Upon being told that his name was "Westwood," George Walter Bowman said, "that is the name of the clergyman in Camden, New Jersey, who married me." Here is an admission of marriage and the statement of name of clergyman and the place where the ceremony was celebrated exactly corresponding with the statement of the marriage certificate. This is a most pregnant and significant fact for the jury. Under the circumstances, no testimony could be more impressive. *Brooke* v. *Brooke*, 60 Md. 524, 533; *Jackson* v. *Jackson*, 80 Md. 193; *Walkup* v. *Pratt*, 5 H. & J. 56; *Barnum* v. *Barnum*, 42 Md. 301.

And under the second exception it was proposed to show that the family of Bowman knew from 1887 to 1900 that he was married. This is admissible as evidence to go to the jury on the question of identity. And if the lower Court was right in holding, as we shall later see it did, that the circumstances of this case raised a presumption that the first marriage had been terminated by divorce before the second was consummated, the fact that the family knew that this marriage of 1887 was not dissolved before said marriage in 1900, was evidence of the highest importance to the appellant and the Court committed a grievous error in not permitting Furst to tes-

tify.   The members of the family are now all dead, and their evidence in a question of pedigree (*marriage*) is always admissible.   *Craufurd* v. *Blackburn*, 17 Md. 49, 53.

An original party to a contract is not disqualified to testify, where the other party is dead and his administrators are parties to the cause, except and only as to any transaction had with, or statement made by the intestate.

The change made by the Act of 1904, ch. 661, in the law relating to the competency of witnesses is patent and important.   Under the law as it existed prior to 1902, the mere fact that the original party was dead, or his executor or administrator was a party to the proceedings of itself, totally disqualified the other party and prevented him from testifying to *anything*, except upon the call of the other side.   Under the Act of 1904 and as the law was when this case was instituted, there is no *total disqualification* but only a *partial* disqualification.   This partial disqualification is limited and confined by the terms of the Act to "any transactions had with, or statements made by the testator, intestate, etc., unless called to testify by the opposite party."   Outside of this limited and partial disqualification, the witness is free to testify.   The test that the Court must apply under these exceptions is that prescribed by the Act.   If the witness was asked in regard to any *transaction had with* George Walter Bowman, she was incompetent to testify.   Or if the witness had been asked to narrate *any statement made* by George Walter Bowman, she was incompetent to testify.   In all other respects she was as competent to testify as any witness produced in the cause. *Graves* v. *Spedden*, 46 Md. 538; *Le Brun* v. *Le Brun*, 55 Md. 503.

Now the error of the lower Court was in refusing to see the sweeping change made in the law.   The witness was not asked to testify as to any transaction had with George Walter Bowman, nor to any statement made by him to her.   The appellant knew that she could not on her own offer testify to the marriage between her and George Walter Bowman and to his statements to her; and so no attempt was made to do this.

The appellant was asked her present name, the Court declined to allow her to answer. She was asked her maiden name, the Court declined to allow her to reply. She was asked if she had been married prior to 1887; the name of her mother, where she lived in 1887, and her address; the place of her birth, the name of her father, and his residence, and the Court enforced her silence. We do not think the appellant's maiden name, the name of her father and her mother, and their residences and addresses could be the result of any transaction had with George W. Bowman by the appellant.

The appellant was next asked where she was on July 12th, 1887, and if she had ever met a Rev. John R. Westwood and a Miss Mary Westwood, and what were their residences, their occupations and when and where she met them. No transaction with George Walter Bowman is here involved. He is not yet on the scene, but the Court refused the witness the opportunity to answer.

We asked the appellant if she ever knew a man by the name of George Walter Bowman, of Hagerstown, Maryland, and if she knew him in July, 1887; and if she had ever been with him in Camden, New Jersey, and where and when. But the Court declined to allow her to say that she knew him, and that she had met him at any time in Camden, New Jersey. With submission, we argue that knowing and meeting a man, and the statement of that fact, are not testimony as to any transaction had with him. Witness was not asked to state what took place at any meeting, nor what Bowman said to her. How then can this evidence be excluded under the Act of 1904? Then we inquired of the plaintiff if she did not have a marriage certificate showing a marriage between herself and (not *the* George Walter Bowman but) "a man by the name of George Walter Bowman" who had destroyed the original. The Court would not suffer this to have a reply, although even under the law as it formerly stood the Court of Appeals has held the witness competent to answer a similar interrogatory. *Ahl* v. *Ahl*, 71 Md. 555, 560.

The appellant is next asked who were Catherine and John

McGranagan, and if she had ever lived in Hagerstown, and when and how long and with whom. Upon the objection of the appellee, this testimony was not admitted. Like all the other questions asked the witness, this one did not seek information in regard to a transaction with George Walter Bowman, or in respect to any statements made by him.

The lower Court did not justify its action on the ground that this evidence was of an inadmissible character, but upon the theory that the appellant was not a competent witness. As we have seen, the language of the Act of 1904, ch. 661, is a complete specific refutation of the Court's position. Argument on this point is impossible. The lower Court made the mistake of applying a repealed rule of evidence.

All of the evidence sought to be adduced and given by the appellant would have been admissible if given by any one else for the purpose of establishing the identity of the appellant with the person named in the certificate of marriage later offered in evidence by the appellant. This evidence would have shown the correspondence between the statements in the marriage certificate with the actual facts of the appellant's birth and parentage, name and residence and would have been proper testimony from which they could find that the appellant was one and the same person with the person named in the marriage certificate offered in evidence by Catherine E. Bowman in this case.

The proof offered was neither proof of a marriage nor *direct* proof of the identity of the parties, but it was only proof of relevant facts from which the jury might infer from the correspondence of names and places that the appellant was the same Catherine E. Bowman named in the marriage certificate.

Where a prior and ceremonial marriage is established the mere fact of a form of second marriage is not admissible, unless accompanied by an offer to show the invalidity of the first or its dissolution.

Despite the difficulties occasioned by time and death, the appellant was able to establish the ceremonial marriage by uncontroverted and indisputable evidence. The record evi-

dence was produced, and shown by the laws of New Jersey offered in evidence as well as by testimony of the New Jersey lawyers to be in conformity with the New Jersey laws and to be the most appropriate evidence of the marriage. Next the name of the appellant was established, it being shown that her name was *Catherine E. Boyer*, her mother afterwards marrying Zimmerman, and that she left home at the age of two or three to be legally adopted by John and Sarah McGranagan, with whom she lived on Second street in Harrisburg. That the maiden name of Sarah McGranagan was Sarah Weaver, and that appellant was twenty-four years of age, being born July 11th, 1863, and it was furthermore shown by uncontradicted proof that the intestate was named George W. (Walter) Bowman, whose residence in 1887 was Hagerstown, his age about twenty-seven, and his business that of confectioner, whose father's name was George R. Bowman, and whose mother's maiden name was Catherine B. Greenawalt. After this proof was given, *none being offered to contradict it*, the correspendence of names, paternity, birth place, residence, occupation and ages with those of the "Marriage Certificate" and "Certificate of Record of Marriage" offered in evidence demonstrate to a certainty that the appellant and George Walter Bowman, the intestate, were married at Camden, New Jersey, by a ceremonial and religious marriage on July 12th, 1887. No evidence having been given to the contrary, the presumption of identity arising from this proof would be conclusive. But the appellant did not stop here, she proved by her mother that her daughter and the intestate, George Walter Bowman, visited her in July, 1887, and that "When they came to see me in Harrisburg, they professed to come from Camden, New Jersey; and George W. Bowman said they had come from Camden, New Jersey' and he introduced himself as my son-in-law, and said he and my daughter were married in Camden, New Jersey. This witness afterwards visited them in Hagerstown. And Dr. E. A. Wareham, one of Hagerstown's most reputable and prominent physicians, testifies that he had been Bowman's physician for about twenty

years, and that Bowman and appellant were living together in Hagerstown, and that he was employed to attend her as Bowman's wife. Here is evidence of the most direct and positive character and the appellee did not attempt to gainsay it. Nothing could be more conclusive, and it must be taken as established in this case that Bowman and appellant were married by a valid *ceremonial* marriage on July 12th, 1887, at Camden, New Jersey. *Barnum* v. *Barnum*, 42 Md. 299; *Brooke* v. *Brooke*, 60 Md. 524, 525–528, 533; *Bullock* v. *Hunter*, 44 Md. 416, 427; *Elliott* v. *Knott*, 14 Md. 121, 135; *White* v. *McClellan*, 62 Md. 347, 352; *Nelson* v. *Willey*, 97 Md. 373, 381; 15 *Am. & Eng. Ency. of Law*, 2 ed., 918.

The appellant had made out her case. All subsequent marriages were spurious. A valid ceremonial marriage being shown, neither separation, nor unfaithfulness after marriage nor misconduct before, nor a form of second marriage could be evidence to. annul the first marriage. The first marriage could only be avoided

(a) By proof that the appellant was not the person named in the record offered in evidence; (*and of this no proof was offered*) or

(b) By death of wife (*and of this there was and could be no evidence*); or

(c) By divorce (*and of this no evidence was or could be offered*).

Accordingly, the mere evidence of a second marriage un-accompanied by any offer of proof of said facts and circum-stances as would make a second marriage relevant or material was inadmissible; and the Court committed a reversible error in allowing it to be given.

By the plaintiff's fifteenth prayer, which was rejected the jury were instructed that the similarity of names in the marriage certificate offered in evidence by the plaintiff with the plaintiff in this case, and the decedent, George W. Bowman, late of Washington County, deceased, raises a presumption in law that the persons are the same.

This prayer stated a well-known principle of law, and was

especially important for the guidance of the jury. *Elliott* v. *Knott*, 14 Md. 135; *Bullock* v. *Hunter*, 44 Md. 427; *Nelson* v. *Willey*, 97 Md. 381; *Brooke* v. *Brooke*, 60 Md. 524; *White* v. *McClellan*, 62 Md. 352; 15 *Am. & Eng. Ency. of Law*, 2 ed., 918, 921; *Stebbins* v. *Duncan*, 108 U. S. 32; 27 L. ed. 647.

(6) If a valid ceremonial marriage be established then nothing can terminate it short of direct proof of its dissolution by divorce or death.

The following is a classification of the cases in which a presumption will arise against a first marriage upon a second marriage being shown:

Class A. Where a second formal or ceremonial marriage is established, a prior marriage will not be presumed from mere repute and cohabitation. *Moore* v. *Moore*, 102 Tenn. 148; *Hull* v. *Rawls*, 27 Miss. 471; *Waddingham* v. *Waddingham*, 21 Mo. App. 471; *Myatt* v. *Myatt*, 49 Ill. 475. (In the case at bar, the *first* marriage is a formal or ceremonial one, and so these cases do not apply).

Class B. Where the first wife or husband is not a party to the cause and is not a claimant, and where a third party seeks to escape an obligation by showing that second marriage is invalid by reason of a prior one, the following cases hold a presumption of divorce will arise upon the proof of the second marriage and throw upon the party seeking to escape, the burden of proof. *Railway Co.* v. *Beardsley*, 79 Miss. 417; *Lampkin* v. *Ins. Co.*, 11 Colo. App. 249; *Klein and wife* v. *Landman*, 29 Mo. 259; *Erwin* v. *English*, 61 Conn. 502; *Linden* v. *Kelly*, 6 W. N. C. (Pa.) 95; *United States* v. *Green*, 98 Fed. Rep. 63; *Parsons* v. *G. L. A. O. U. W.*, 108 Iowa, 1, 8; *Boulden* v. *McIntire*, 119 Ind. 574; *Wenning* v. *Teeple*, 144 Ind. 189; *Coal Run Co.* v. *Jones*, 127 Ill. 386. (In these cases the question of validity of second marriage is generally a collateral one, and the first wife, not being a party, is not bound. In the case at bar the first wife is a party and is a claimant, and has first proved her ceremonial marriage, and third parties are not contesting, but two women claiming as wives. These facts make the cases in Class B inapplicable, and differentiate them from the present appeal.)

Class C. Hereunder are grouped all the cases that can be regarded as authority for the position of appellee. When examined they will be found not to apply because they are based upon very different state of facts from those presented by the present appeal.

(a) Cases where the party claiming as first wife has herself married a second time during the lifetime of the first husband. *Hadley* v. *Rush*, 21 Mont. 170; *Nixon* v. *L. & C. Co.*, 84 Tex. 412.

(c) *McKibbin* v. *McKibben*, 139 Cala. 448, 450; in which the Court stated "there was evidence from which it could be inferred that there had been a divorce between Lake and plaintiff."

(d) *Leach* v. *Hull*, 95 Iowa, 618, was much relied upon below, but it is submitted that this case is grounded upon estoppel and that its facts prevent any application here. "The parties to the second marriage live and cohabit with each other as husband and wife in the locality where the first wife resides. The first and second wives were introduced to each other as the Mrs. Leach. The first Mrs. Leach is introduced to a daughter of the second. All this occurs without any protest or complaint from the first Mrs. Leach." At the time of the second marriage Leach claimed he was divorced. See 58 Iowa, 720, 723; 78 Iowa, 499, 502.

(e) In the case of *Schmeisseur* v. *Beatrice*, 147 Ill. 210, it is held that the proof of a second marriage threw on the party claiming under the first the burden of showing there had been no divorce. This decision is based upon a *dictum* in *Cartwright* v. *McGown*, 121 Ill. 388, that is only supported by an early Iowa case, later overruled in 78 Iowa, 499; 58 Iowa, 720. But this case of *Schmeissenr* v. *Beatrice* was qualified in *Cole* v. *Cole*, 153 Ill. 585, where it is declared that this burden of proof does not exist when the facts show that the party was not entitled to a divorce. *Brown* v. *Brown*, 142 Ill. 409, 423, in conflict with *Schmeisseur* v. *Beatrice*.

(f) The cases of *Teter* v. *Teter*, 88 Ind. 494; 101 Ind. 129, are not all in point, although relied upon below. The question

in these cases was simply whether or not a marriage could be provable by repute and cohabitation, when the relations were shown to have begun before the woman was divorced from her first husband. The Court held a marriage could be so proved.

*A. C. Strite* and *Chas. D. Wagaman* (with whom was *Chas. E. Fink* on the brief), for the appellees.

It appears from the whole record:

1. That although a ceremonial of marriage valid under the laws of New. Jersey may have been performed and fully proved and the identity of the parties fully established, it does not affirmatively appear that the contracting parties were capable of contracting.

2. If capable of contracting, it does not affirmatively appear that it was an earnest, *bona fide* contract.

3. If capable of contracting and in earnest and *bona fide*, it does not affirmatively appear that said marriage had not been annulled at sometime during the long years of separation of the said parties.

Where issue may be bastardized as in this case, every presumption of law is in favor of the second marriage. *LeBrun* v. *LeBrun*, 55 Md. 504; *Jones* v. *Jones*, 48 Md. 391; *United States* v. *Green*, 98 Fed. Rep. 63; *Stevens* v. *Stevens*, 56 N. J. Eq. 488; 38 Atl. Rep.; *Hull* v. *Rawle*, 27 Miss. 471; 19 *Am. & Eng. Ency. of Law*, 2 ed., p. 1207; and other cases cited on this brief.

And the burden is upon the plaintiff in this case to overcome such presumption by proof, even to the extent of proving a negative if that be necessary. *Boulden* v. *McIntire*, 21 N. E. Rep. 445–448 (Ind.); *Leech* v. *Hall*, 64 N. W. Rep. 792–95 Ia. 618; *Harris* v. *Harris*, 8 Ill. App. 57; *U. S.* v. *Green*, 98 Fed. Rep. 63–64. Where a marriage *de facto* is followed by cohabitation and issue there is not only the ordinary presumption in favor of its validity, but, being assailed upon the ground that a former marriage of the man was still subsisting, the law always presumes against the committing of crime and

in favor of innocence. *LeBrun & LeBrun*, 55 Md. 504; *Jones* v. *Jones*, 48 Md. 391; *Dixon* v. *People*, 18 Mich. 84; *Greensboro* v. *Underhill*, 2 Vt. 606; *Rex* v. *Twyning*, 2 Barn. & Ald. 386; *Bishop, on Marrage iand Divorce*, sec. 457.

It does not appear in the proof that the plaintiff was competent to enter into the marriage relation with Bowman in July, 1887, and a second marriage having been shown, it will not be presumed that she was competent. It was at least incumbent on the plaintiff to show that at and before the date of her alleged marriage she was single. *U. S.* v. *Green*, 98 Fed. Rep. 66. The law will indulge in many presumptions in favor of the second marriage. *Squire* v. *State*, 46 Ind. 469.

It is a fair deduction from the testimony in this case that if the plaintiff and the decedent were the parties to a ceremonial of marriage in Camden, New Jersey, on July 12th, 1887, they never intended that it should have any binding force. They never treated it as a valid marriage, and the strong probability is that it was actually void under the laws of New Jersey. A simple marriage ceremony will not make a man and woman husband and wife. Capacity and consent are absolutely essential; but celebration only contingently so in New Jersey. *McClurg* v. *Terry*, 21 N. J. Eq. 225; *Selah* v. *Selah*, 23 N. J. Eq. 185; *Stevens* v. *Stevens*, 56 N. J. Eq. 488; *Cartwright* v. *McGown*, 121 Ills. 388; *Thompson* v. *Thompson*, 114 Mass. 566; *Merriam* v. *Wolcott*, 61 How. Pr. 377; *Rundle* v. *Pegram*, 49 Miss. 751.

The law presumes, under the facts in this case, that either Bowman or his first wife, if validly married, had obtained a divorce before the second marriage, and the burden is upon the plaintiff to prove that no divorce had been granted. *Coal Run Coal Co.* v. *Jones*, 8 N. E. Rep. 869; *Johnson* v. *Johnson*, 3 N. E. Rep. 232; *Leach* v. *Hall*, 64 N. W. Rep. 792, 95 Iowa, 618; *Klein* v. *Landman*, 29 Mo. 259; *Blanchard* v. *Lambert*, 43 Iowa, 228; *Tuttle* v. *Raish*, 116 Iowa, 331; *Carroll* v. *Carroll*, 20 Tex. 731; *Cartwright* v. *McGown*, 2 Am. St. Rep. 105; *In re Edwards*, 58 Iowa, 451; *Squire* v. *The State*, 121 Ill. 388; 46 Ind. 459; *Boulden* v. *McIntire*, 21 N. E. Rep. 445 (Ind.);

*Ellis* v. *Ellis*, 13 N. W. Rep. 65; 58 Iowa, 720; *Gilman* v. *Sheets*, 43 N. W. Rep. 299, 78 Iowa, 500; *Barnes* v. *Barnes*, 57 N. W. Rep. 851, 90 Iowa, 282; 19 *Am. & Eng. Enc. of Law*, 2 ed., p. 1209.

It will be noticed that the application of the aforegoing principles is not limited to cases where a prior marriage by cohabitation and repute is set up; but that they apply with equally as much force to prior, valid, ceremonial marriages. In our own State we refer to the *LeBrun case, supra.* It is submitted that upon the authorities here cited, the aforegoing propositions of law are good, and it follows that the plaintiff's prayers were properly rejected.

As to the correctness of the Court's ruling in rejecting the plaintiff's 15th prayer, we refer the Court to 19 *Am. & Eng. Enc. of Law*, p. 1200, note and cases cited; *LeBrun* v. *LeBrun*, 55 Md. 505; *Brooke* v. *Brooke*, 60 Md. 533.

McSHERRY, C. J., delivered the opinion of the Court.

G. Walter Bowman, late of Washington County, died intestate on March the fourth, nineteen hundred and three. The administrators of his personal estate filed in the Orphans' Court a petition asking that a day be assigned for the distribution of his assets. Due notice of this was given and later on a person claiming that she was the widow of the deceased, to whom she asserted she had been married on July 12th, 1887, at Camden, New Jersey, and giving her name as Catherine E. Bowman, appeared to the proceedings and asked that the share of the estate rightfully belonging to a widow should be turned over to her. Subsequently a certain Lettie E. Bowman, also claiming to be the widow of the deceased to whom she was married on January 18th, 1900, set up a similar claim. After other proceedings were had issues were finally framed and transmitted to the Circuit Court for trial. In the order sending the issues to the law Court, Catherine E. Bowman was made plaintiff and Lettie E. Bowman and the administrators were made defendants. Upon the suggestion and affidavit of the plaintiff the record of the issues was re-

moved to the Circuit Court for Carroll County where a jury was impanelled and the questions were tried.

The issues were as follows: "1st. Was Catherine E. Bowman at the time of the death of G. Walter Bowman the lawful wife of G. Walter Bowman ? . 2nd. Was Lettie E. Bowman at the time of the death of G. Walter Bowman the lawful wife of G. Walter Bowman ?" During the progress of the trial eighteen exceptions were reserved—of which seventeen relate to rulings on the admissibility of evidence, and the last concerns the action of the Court on the numerous prayers presented by both sides for instructions to the jury. The verdict was in favor of the defendants; or to be more precise, the jury answered the first issue in the negative; and the second in the affirmative. From the rulings set forth in the bills of exception the plaintiff has appealed.

It is obvious from this outline of the case that the single question before the jury was ; which of these two women is the lawful widow of the decedent ? Around that question all the subordinate inquiries presented by the record revolve. There is not the slightest reason to doubt that Lettie E. Bowman, formerly Lettie E. Eakel, was in a formal manner, married to G. Walter Bowman in January, 1900, by a regularly ordained minister of the gospel. That fact is beyond controversy. The fruit of that marriage is one child, Walter E. Bowman, who, by his guardian, is also a party to these proceedings.

At the close of the evidence the defendants, amongst other prayers, presented the following :

1st. That the verdict of the jury must be against the plaintiff upon the first issue, and their answer to said first issue must be "No," because the plaintiff has offered no legally sufficient evidence to prove that George Walter Bowman referred to in the record of a marriage in Camden, New Jersey, offered in evidence, is the same George Walter Bowman upon whose estate letters of administration have been granted to the defendant administrators in this case.

2nd. That the verdict of the jury must be against the plaintiff upon the first issue, and their answer to said first issue must be "No," because the plaintiff has offered no legally sufficient evidence to prove that the Catharine McGranigan referred to in the record of a marriage in Camden, New Jersey, offered in evidence is the same person as the plaintiff in this case.

They were rejected. If they *ought* to have been granted there is an end of the plaintiff's case, even though there may have been errors in other rulings found in the record. Proof of the marriage of G. Walter Bowman, the decedent, to the plaintiff at the *time* and *place* alleged by her was absolutely indispensable. No one can contravene that proposition. But what kind of evidence is necessary to establish that *status* or relation, and of what probative value should it be, when the consequences incident to the sustentation of the alleged marriage of July, 1887, must inevitably be the branding of the deceased with the crime of bigamy, and the bastardizing of the innocent off-spring of the marriage of 1900? Let us first see what measure of evidence the law requires in such circumstances and upon what presumptions it relies. In *Taylor* v. *Taylor*, 1 Lee, 571, 5 Eng. Ecc. Rep. 454, where two women severally claimed administration of the effects of a decedent as being his widow (which was twice before the Ecclesiastical Court in England) it was said there must be *"strict proof"* of the alleged antecedent marriage *"as an actual fact."* And this was cited with approval by this Court in *Jones* v. *Jones*, 45 Md. 159, and in the same case, 48 Md. 398. The reason upon which the doctrine that there must be "strict proof" of the first marriage, rests is apparent. When the *presumption* of a lawful marriage is met by a counter presumption of *innocence*, the former must yield to the force of the latter. After it has been shown that there was an actual marriage solemnized in the method which the law prescribes and followed by the birth of issue; every inference is invoked in support of its validity and against an alleged antecedent marriage, because the presumptions of the law are always in favor of *in-*

nocence and of legitimacy. "The law presumes morality and not immorality, marriage and not concubinage, legitimacy and not bastardy." *Teter* v. *Teter*, 101 Ind. 129, cited in note 3, p. 1202, 19 Am. & Eng. Ency. L. (2nd ed.); *Rooney* v. *Rooney*, 54 N. J. Eq. 246 ; *Patterson* v. *Gainse*, 6 How. 550. In *King* v. *Inhabitants of Twyning*, 2 Bar. & Ald. 386, a very strong illustration of the predominance of the presumption of innocence over other presumptions is furnished. The case involved merely the settlement of a pauper. A woman had married a soldier who soon afterwards left for the East Indies. Within twelve months she married again, and the question turned upon the validity of the second marriage, and it was upheld. BAILEY, J., said : "The facts of the case are that there is a marriage of the pauper with Francis Burns, which is *prima facie* valid, but the year before that took place she was the wife of Richard Winter, and if he was alive at the time of the second marriage, it was illegal and she was guilty of bigamy. But are we to presume that Winter was then alive ? If the pauper had been indicted for bigamy, it would clearly not be sufficient. In that case Winter must have been proved to have been alive at the time of the second marriage. It is contended that his *death* ought to have been proved, but the answer is that the *presumption of law* is, that he was *not alive* when the consequence of his being so is, that *another person has committed a criminal act*." This is quoted with approval and adopted in *Jones* v. *Jones*, 48 Md. 399, and the case is cited as an authority in *Le Brun* v. *Le Brun*, 55 Md. 504. In *Piers* v. *Piers*, 2 H. L. Cas. 331, it was held that the question of the validity of a marriage cannot be tried like any other question of fact which is independent of presumptions, for the law will presume in favor of marriage, and that this presumption must be met by strong, distinct and satisfactory disproof. It is not denied that in this country there is some conflict of decisions and of judicial opinion on this subject as was admitted in *Jones* v. *Jones*, 48 Md. 399 ; "but it cannot, we think (observed this Court in that case) be said that the preponderance of authority is the other way." The

law in this State is undoubtedly as the Maryland cases above cited have announced it. Now let us see whether the evidence adduced by the plaintiff measured up to these requirements and overthrew the presumptions to which we have alluded.

The evidence admitted consists of three distinct items of proof, and that which was offered and rejected comprises two others. These will be separately dealt with. It must not be forgotten that the burden of proof is on the plaintiff to establish by *"strict proof"* the prior marriage as a ground for the annulment of the second one, which otherwise is confessedly valid. To discharge that burden there were adduced a marriage certificate; the testimony of a witness to certain occurrences in Harrisburg, Pennsylvania; and the testimony of a witness as to some things which transpired in Hagerstown. As the certificate is the most important feature of the plaintiff's evidence it will now be transcribed.

State of New Jersey.

*Marriage Certificate.*

Full name of husband, George W. Bowman. Place of res idence Haleystown, Md. (If in the City, give name street and Number; if in a township give name of County.)

Age 25 years, — *months*, Number of his marriage, *First. Occupation, Confectioner, Country of birth, U. S. A. Name of father, George R.* Country of Birth *U. S. A.* Full maiden name of wife, *Catherine McGranagan.* Country of Birth, *U. S. A.* Place of residence, E. Harrisburg, Pa. (If in a City give name, street number, if in a township give name and county.) Age nearest birthday, *24.* If any trade or business so state.) Last name if a widow, ———— ———— Number of brides marriage, 1st. Name of father, *John* ; Country of birth, *U. S. A.* Maiden name of mother, *Sarah Weaver,* Country of birth, *U. S. A.* Date (in full) *July 12th, 1887.* Place, Camden, N. J.

In presence of Mary Westwood.

John R. Westwood.

The certificate shows that George W. Bowman of *Haleystown* was married to Catharine McGranagan, of *E. Harrisburg*, Pennsylvania; but it does *not* show that the George W. Bowman therein named was the identical G. Walter Bowman of *Ha-*

*gerstown* whose estate is involved in this controversy. The certificate shows that George W. Bowman was married to Catharine McGranagan of *E. Harrisburg* but it does *not* show that the Catharine McGranagan therein mentioned is the identical Catharine E. Bowman who is the plaintiff in this case. The certificate does not and could not prove an *extrinsic* fact, and personal identity *is* an extrinsic fact. You may say it is not probable that some one personated Bowman, the deceased, and that some one else personated the plaintiff in the alleged New Jersey marriage. Perhaps that is so; and perhaps, too, it is not probable that the delineation given in the certificate of the persons mentioned therein would have corresponded so closely with the description of the deceased and of the plain-- tiff, as it apparently does, if the deceased and the plaintiff were not the real parties who were married in July, 1887, at Camden; but the sum of these probabilities, plus all other probabilities that may be suggested from the record, would still be only a probability. Or, to state the same thing in a more precise way: A conclusion logically drawn from premises which are themselves mere probabilities; must of necessity be only a mere probability also, because a conclusion, to be formal, must always be contained in the premises, and probabilities can never contain a certainty. There is not a shred of evidence to establish the identity of the parties named in the certificate. Suppose it be conceded that the certificate proves that *some man* giving the same name, the same occupation and the same place of residence as George Walter Bowman had, was married to *some woman* giving the same name and the same residence as the plaintiff professes to have had; still, it does *not* prove that the G. Walter Bowman, now deceased, *was that man;* or, that the *plaintiff was that woman.* To justify the conclusion from the certificate alone that the plaintiff and G. Walter Bowman were then and there married, it must be *inferred* that G. Walter Bowman now dead was the *identical* man described in the certificate, although the Bowman mentioned was said to be twenty-five years old and the deceased was then, according to the evidence, twenty-seven

years of age; and it must be inferred that the plaintiff is the *identical woman* named in the same certificate, although her residence was given as East Harrisburg when she actually lived in Hagerstown.   Two such improbable inferences must thus take the place of *"strict proof"* as to personal identity; and to be availing those same inferences must overcome the counter presumptions of innocence and legitimacy arising from the subsequent marriage of G. Walter Bowman to Lettie E. Eakel—a thing they are powerless to do, because these latter presumptions yield only to *evidence* which establishes a mental conviction amounting to a moral certainty—and a probability can never produce a moral certainty.

The authorities are clear upon the proposition that there must be evidence of the identity of the parties beyond the mere statements contained in the certificate.   "Where the evidence of marriage consists of the certificate, license, or marriage record, the identity of the parties must also be established by satisfactory evidence."   19 *Am. & Eng. Enc. of L.*, (2 ed.) 1200, and cases in note 3.   A very apt illustration of the doctrine stated in the text is to be found in the case of *Brooke* v. *Brooke*, 60 Md. 524.   It was shown there from the records of the church where the marriage was solemnized, that Henry Brooke and Margaret A. Ridgely were married on February 29th, 1872.   After the death of Brooke a claim was made by Margaret that she was his widow.   This was disputed by the executor of the decedent.   It was shown by the latter that the parties never lived together as man and wife after the alleged ceremonial marriage, though Brooke did not die until 1879; and the contention was that some one else had personated Brooke at the ceremony.   The case for the widow was not permitted to rest upon the mere identity or similarity of the *names* on the church register, nor upon the testimony of the clergyman that he had joined in wedlock two persons giving the names of the deceased and the claimant; but a photograph of Brooke, proved to be an accurate and genuine one, was produced and was identified by the persons who witnessed the marriage, as the likeness or picture of the man who was

actually married to Margaret Ridgely.    Upon that evidence it was decreed that she was the widow of Henry Brooke.

It is true, generally speaking, identity of names is *prima facie* evidence of identity of persons; but the names, of course must be identical, and this involves the identity of the christian names—the identity of the initials thereof being insufficient. 15 *Am. & Eng. Enc. L.*, 418, 919, and cases cited in notes. As already indicated *George* W. Bowman as named in the certificate is by no means idenitical with G. Walter Bowman the deceased, and no inference can be drawn that these two designations point out the *same* individual; especially when that dissimilarity is appealed to as evidencing an identity, which, if established in that way, would overthrow the strong presumptions in favor of innocence and legitimacy.

The next evidence relied on to prove identity is that given by Mrs. Zimmerman, the mother of the plaintiff.    This witness testified as follows:  "I met and knew George W. Bowman in July, 1887, at my house in Harrisburg, and my daughter, the plaintiff, was with him.    They stayed with me during the day and at night at the hotel for two or three days; and I afterwards visited them at Hagerstown in the fall of the same year at Walnut street in Hagerstown, where they were living together.    No one else lived in the house with them, when they came to see me in Harrisburg they professed to come from Camden, New Jersey; and George W. Bowman said they had come from Camden, New Jersey, and he introduced himself as my son-in-law and he said he and my daughter were married in Camden, New Jersey."    It will be perceived, at a glance, that this testimony establishes no independent fact, other than that Bowman and the plaintiff stayed at the house of the witness in Harrisburg during the day and at an hotel during the night, for less than the space of a week; and that when the witness visited them at Walnut street in Hagerstown, the fall of the same year, they were living together; but its chief significance lies in the recital of the declarations made by the supposed husband and wife as to their alleged marriage.    If by this evidence as to the *conduct* of the

parties it was designed to show that Bowman and the plaintiff cohabited as man and wife—that they were man and wife— and, therefore, were the identical persons who had been married in Camden, New Jersey, the conclusion thus sought to be deduced cannot be accepted as impugning the validity of the marriage to the defendant, Lettie E. Bowman, especially, as the conduct thus relied on was just as consistent with concubinage as with matrimony, when it is remembered that the house on Walnut street was a house of ill-fame and that the plaintiff was a prostitute. "A prior marriage will not be presumed from cohabitation, acknowledgment and reputation, where such presumption will render void a second marriage formally solemnized." 19 *Am. & Eng. Enc. L.* (2 ed.) 1206, and cases in note 4. If, on the other hand, the *declarations* of the parties have been introduced and are relied on to establish personal identity, they are palpably unavailing and plainly inadmissible for that purpose. In the case of *Le Brun* v. *Le Brun, supra,* this Court said : "Marriage has been considered among all civilized nations, as the most important contract into which individuals can enter, as the *parent,* not the *child* of civil society. The great basis of human society throughout the civilized world, is founded on marriages and legitimate off-spring; and where an existing marriage is proved, it is not to be exposed to the danger of being set aside by any species of collusion, or by the mere declarations of either of the parties, and should only be brought in question upon the most undisputed proofs. *Shelford on Marriage and Divorce,* 573; *Fornshill* v. *Murray,* 1 Bland, 481; *Piers* v. *Piers,* 2 H. L. Cas. 331; *Gaines* v. *Relf,* 12 How. 472." The association for the two or three days which Bowman and the plaintiff were together in Harrisburg and their occupancy of the same house in Hagerstown do not prove the fact of their marriage, nor tend to establish the identity of the individuals named in the certificate. Their association for those two or three days or their occupancy of an house of evil repute, is not "*undisputed proof*" of their marriage, when if such an effect is given to either or both of those facts, the issue of the second mar-

riage will be bastardized and the crime of bigamy will be imputed to and fastened on the decedent. Whilst this is not a suit for *nullity* of marriage, the degree of evidence as to *identity* demanded in this proceeding is no less rigid than in that. "In a suit for nullity of marriage, by reason of a former marriage, strict proof of the identity of the parties is requisite. *It is a clear rule that the identity must be proved by other testimony than that of the parties themselves,* that is, by witnesses who can speak of the facts *from their own personal knowledge.*" Shelford, Mar. & Div., as quoted with approval in *Le Brun* v. *Le Brun.* The testimony of Mrs. Zimmerman has therefore no probative value.

The testimony of Dr. Wareham was as follows: "I knew the lady sitting there (indicating the plaintiff) at one time as the wife of George Walter Bowman. I was George Walter Bowman's physician for about twenty years for his first and second wife. At the time I knew plaintiff she was living in Hagerstown on North Walnut street, in a house in which the plaintiff and George Walter Bowman lived. At this time George Walter Bowman employed me to attend to her as his wife * * *. I do not know who owned the house in which I attended her on Walnut street. All I know is that George Walter Bowman employed me to go there and he was there. I do not know if whether or not he was living there. There was no one else living there to my knowledge, and I saw him there day and night. I cannot tell how often, and he paid me." Leaving out of view the testimony which proved that the house on North Walnut street was a bawdy house and that the plaintiff was an inmate thereof under the name of Edith Boyer, and that under *that* name she was arrested and fined for disorderly conduct in April, 1888—more than eight months after her alleged marriage at Camden—leaving all this out of view, does the testimony of Dr. Wareham amount to anything more than his inference or opinion that Bowman and the plaintiff were man and wife—an inference or opinion drawn from or founded on the statements of Bowman? As Bowman's own statements would be inadmis-

sible to prove identity the conclusions of a witness drawn from those same statements are equally incompetent. Hence this testimony furnishes no evidence of identity.

The plaintiff was offered as a witness but was not allowed to testify. She was not a competent witness to prove the marriage either directly or indirectly, because Bowman was dead. *Redgrave* v. *Redgrave*, 38 Md. 96; *Denison* v. *Denison*, 35 Md. 361; 19 *Am. & Eng. Ency. of Law*, 1198.

The only other evidence proffered on this same subject was the testimony of Clyde B. Furst, a nephew of the deceased, and who would be entitled to one-half of the personal estate left by Bowman if the second marriage were annulled and the first one were upheld. In the first bill of exceptions he was asked to give a conversation had with his uncle, with a view of establishing by the uncle's admissions his identity with the Bowman named in the marriage certificate. The Court was right in excluding the testimony. Identity cannot be proved by the admission of the parties, as has been already pointed out. "Identity must be proved by * * * witnesses who can speak to the facts from their own personal knowledge." In the next exception the same witness was asked, "During this time was it or not known among the family that George Walter Bowman was married?" The question was not allowed to be answered. A marriage solemnized at a particular time and place was set up and relied on, and it was not competent to show *by repute* that there had been a marriage prior to 1900. It did not serve to identify the parties; and as a ceremonial marriage, alleged to have been performed at a designated time and place, was depended on, the proposed evidence, even if it tended to prove by repute that there had been a marriage at sometime, was irrelevant as reflecting on the one upon which the plaintiff relied. Where a marriage is set up as having been performed at a particular place by a particular form or ceremony, and the evidence fails to support the assertion, the party so alleging such a marriage will not be at liberty to rely on general repute to establish it. *Jackson* v. *Jackson*, 82 Md. 28; *Barnum* v. *Barnum*, 42 Md. 251.

It was also inadmissible for the reason given in discussing the testimony of Mrs. Zimmerman, 19 *Am. & Eng. Ency. L.*, 1206.

Inasmuch as there is not a shred of evidence in the record to identify the parties named in the New Jersey certificate, or to show that one was the decedent and the other was the plaintiff, the latter's contention must fall to the ground; and it becomes wholly immaterial what were the other rulings in the case.

The third, fourth, fifth, sixth, seventh, eighth and ninth exceptions were taken to the refusal of the Court to allow the plaintiff to testify in chief, and the fourteenth, fifteenth, sixteenth and seventeenth exceptions were reserved in consequence of the Court excluding the plaintiff as a witness in rebuttal. There was no error committed in any of those rulings. The evidence sought to be introduced either tended to prove the identity of the plaintiff, or it did not. If it did, it was inadmissible because she was incompetent to prove that identity. If it did not tend to prove her identity it was irrelevant.

The ruling in the tenth exception was right. It merely permitted the defendant to prove her marriage to Bowman. That was one of the issues before the jury.

The rulings in the eleventh, twelfth and thirteenth exceptions admitted evidence adduced to show by what name the plaintiff was formerly known in Hagerstown; what course of life she had led there and upon what charges she had been arrested. If the evidence showed that the plaintiff was *not* the person named in the certificate, it was unnecessary as she had failed to prove that she *was*. If it did not do this, it was immaterial. In either event its admission did no injury in view of the fact that the defendant's first and second prayers ought to have been granted. There is no reversible error assigned in those exceptions,

The prayers need not be discussed, because if those granted at the instance of the defendants were wrong, they did no injury, inasmuch as the plaintiff had wholly failed to prove the marriage upon which she relied, and as, in that view, she was

not entitled to a verdict at all, she could not have been prejudiced by instructions which permitted a verdict to be rendered against her on other and different grounds.    If the trial Court was abstractly wrong in rejecting the prayers of the plaintiff, no injury was done, inasmuch as by reason of her failure to furnish adequate proof of identity she had no standing before the jury; and she cannot complain because prayers, which proceeded upon the theory that such proof had been offered, were rejected, when they were rightly rejected for the reason that no such proof had been adduced.

Since the verdict was right as a result of the failure of proof on the point we have indicated, it will not be disturbed; and the rulings will be affirmed without deciding that they would have been, in all respects, free from error under a different state of facts as to the identity of the parties.    We are not to be understood as committing ourselves to the accuracy of any of the rulings on the prayers, if the alleged first marriage and the identity of the parties had been satisfactorily proved, or if evidence tending to prove those requisites had been introduced.    By affirming those rulings *in this case* we merely decide that, because the identity was not established, no reversible error has been shown to the prejudice or injury of the appellant.    With this explanation the rulings are affirmed and the cause is remanded to the end that the findings of the jury may be certified to the Orphans' Court of Washington County.

*Rulings affirmed and cause remanded.*

(Decided June 21st, 1905.)

PEARCE, J., dissented and delivered the following opinion.

I have heretofore expressed my conviction that dissenting opinions should be rarely indulged in.    The conclusions of the Court, after argument and deliberation, always carry with them the presumption of correctness, and frequent dissents weaken the voice of authority without commending the dissenter.    Even when it is felt to be a duty to dissent, it does not follow that it is always wise to assign reasons therefor,

but after a sincere attempt to reconcile myself to the disposition of this case, I have not been able to do so, and as it deals with a question of vital importance to the social and domestic fabric, in a form never before presented in this State, I feel that I am justified in expressing the views which I am unable to yield to those of my brothers.

The Circuit Court rejected the defendants first and second prayers, which are transcribed in full in the opinion of this Court, the first asking an instruction that there was no legally sufficient evidence of the identity of George Walter Bowman, referred to in the record of the marriage in Camden, New Jersey, offered in evidence, with the George Walter Bowman whose estate is the subject of controversy in this case; and the second asking an instruction that there is no legally sufficient evidence of the identity of the Catherine McGranagan referred to in the record of said marriage, with the plaintiff in this case. This Court holding these prayers should have been granted, it became immaterial to inquire whether there were other errors in the rulings in the record, since there could be no recovery by the plaintiff without proof of such identity. In my opinion these prayers were properly rejected for the reasons which I shall endeavor to state, and in that connection I shall consider the plaintiff's fifteenth prayer, which was rejected, and which asked an instruction that the similarity of names in the record of the marriage at Camden, New Jersey; with the names of the plaintiff and the defendants intestate, raises a presumption in law that the persons are the same.

Certainly, proof of the marriage of the plaintiff at the time and place alleged by her, is indispensable to her recovery, but in inquiring "what kind of evidence is necessary to establish that *status* or relation, and of what probative value it should be," it is not necessary to controvert that there must be "strict proof" of such marriage "as an actual fact," as stated in *Taylor* v. *Taylor*, 5 Eng. Ecc. Rep. 454. I do not understand however that "strict proof," either as applied to identity of persons, or any other issue of fact, is the equivalent of mathematical demonstration, or that in determining the identity of

parties to an alleged marriage, it can only be satisfied by the testimony of living witnesses to the performance of the marriage ceremony. The word "strict," is defined in the Century Dictionary as, "exacting, rigorous, severe," and that definition best accords with the general acceptation of the word. There are degrees of strictness, and *strict* proof is not *strictest* proof. Shakespeake speaks of *"strict* statutes," of *"more strict* restraint," and of *"strictest degrees."* In law, "strict construction excludes mere implications, but does not require a literal and blind adhesion to mere words." Thus the rule that attachments can only be sustained on "strict compliance" with the terms of the statute has been construed to mean, by a *substantial* compliance therewith. 27 *Am. & Eng. Enc.* 189. The case of *Jones* v. *Jones*, 45 Md. 144, cited in the opinion in this case to sustain the ruling of this Court upon these prayers, I conceive to be authority for the ruling made by the lower Court in refusing them. That was a case of issues to a jury involving the proof of an alleged marriage, and one of the defendant's prayers concluded with an assertion that there was no evidence of any such marriage. This was refused by the Superior Court of Baltimore City, and in affirming this ruling JUDGE ALVEY said, "Whatever we may think of the verdict *as the result of the whole evidence in the cause*, this Court will not say that the entire case, *or the consideration of any particular question involved in it*, should be taken from the jury, upon a prayer that there is no sufficient evidence to justify the finding for the adverse party, if there be any evidence from which a rational conclusion may be drawn as opposed to the theory of such prayer. Before such a prayer can be granted, the Court must assume the truth of all the evidence before the jury *tending to sustain the claim or defense*, as the case may be, *and of all inferences of fact* fairly deducible from it, as on demurrer to evidence, *and this though such evidence be contradicted in every particular by the opposing evidence in the cause.* Upon no other principle can the case be withdrawn from the consideration of the jury, who alone are competent to decide on facts of which contradictory evidence has been given. But

upon the other hand, where the evidnnce is of such light and
inconclusive nature that no rational conclusion can be fairly
drawn therefrom in support of the claim or defense sought to
be maintained by it, it becomes ·the imperative duty of the
Court to instruct the jury that such evidence is not sufficient
to be considered by them, and that their finding should be
accordingly." The italics in the above quotation are mine.
The principles there announced had been declared in earlier
cases, and have been repeated in later cases, and I have only
cited the passage here for the purpose of showing that those
principles have been applied, without limitation or qualifica-
tion, to a case involving the *fact of marriage*, and that there is
no reason disclosed why they should not be applicable when
the particular question under consideration happens to be the
identity of the parties to an alleged prior marriage and the
consequent validity of a subsequent marriage.

It is no answer to the principles laid down in the passage I
have cited from *Jones* v. *Jones, supra,* to say that "the law
favors morality and not immorality, marriage and not concu-
binage, legitimacy and not bastardy." These are wise and
righteous presumptions, but they are presumptions only.
When confronted with evidence, that evidence must be con-
sidered, and when met by preponderating evidence those pre-
sumptions must yield to such evidence, as other presumptions
must, whatever may be the result; and that evidence must be
submitted to the tribunal which deals with all the other evi-
dence in the case, under the uniform rule which governs the
Courts in determining upon the legal sufficiency of evidence,
irrespective of the particular question to which it is addressed,
unless the presumption be one of the few which are conclusive
in law. The tendency has long been to narrow the list of
conclusive presumptions, and "Courts are now everywhere in-
clined to abandon the arbitrary rules of evidence which formerly
forbade inquiry into the real facts." I *Jones on Evidence*, sec.·
10. If the rule for which I contend be not correct, then a
case may be withdrawn from the jury upon some other prin-
ciple than that which JUDGE ALVEY has declared to be the

*only principle* upon which any case, or the consideration of any question involved therein, can be withdrawn.

In order to justify this dissent, I must recite the evidence admitted (without exception) as touching these two questions in the case.

The marriage certificate which the Court holds to constitute no evidence, either alone, or in conjunction with all the other evidence in the case, legally sufficient to establish the identity of either of the parties mentioned therein, appears twice in the record, first upon page 19, where it appears as Exhibit B, filed in the Orphans' Court with the plaintiff's petition, claiming to be the widow of George W. Bowman, and again on page 24, where a duplicate, certified ten months later than the former, was filed with the depositions taken in New Jersey. In the copy, as transcribed in the opinion of the Court, the residence of George W. Bowman is given as *Haleystown, Md.*, but in both certificates as they appear in the record, his residence is given as *Hagerstown*, Md. It is true that in the plaintiff's petition, she herself states that said residence was written *Haleystown* instead of Hagerstown, in said certificate, but this averment is not sustained by either of the certificates set out in the record, and these certificates are not only better evidence than the averment of the petition, but the only evidence of their contents, which can be accepted, in the absence of a specific agreement of the parties as to the alleged error therein. I allude to this here, because in the opinion of the Court, it is said that this *certificate, for that reason,* does not show, that the George W. Bowman named therein, was from *Hagerstown,* but does show that he was from *Haleystown,* and therefore that he was not the same George W. Bowman whose estate is here in controversy. But even if so written in the certificate, it being admitted without exception, I apprehend that alone would not deprive the jury of the right to consider the certificate, in connection with all the other evidence in the case tending to establish the identity of these parties, any more than would the fact that the certificate gives Catherine McGranagan's residence as E. Harrisburg, Pa., while her

mother gives her residence as Harrisburg, Pa.    These slight discrepancies, or ambiguities, are at most but "contradictions," which under the rule in *Jones* v. *Jones, supra*, are for the decision of the jury and not of the Court.  The certificate states that the George W. Bowman named therein, was a confectioner by occupation, and that his father's name was George R. Bowman.    The record of the return of this marriage (page 24 of the record) states that his mother's maiden name was Greenwalt.    It states that Catherine McGranagan named therein was the daughter of John McGranagan and Sarah Weaver, his wife.    It is of course admitted that there must be evidence of the identity of the parties, beyond the mere statements contained in the certificate, but these statements are abundantly confirmed by the uncontroverted testimony of living witnesses in the case.    Dr. Wareham testifies that he knew George Walter Bowman, that his father was George R. Bowman, who was a confectioner; that the maiden name of George Walter Bowman's mother was Greenwalt; that he knew the plaintiff, then sitting in his presence, as the wife of George Walter Bowman; that he was his physician for about twenty years for his first and second wife; that at the time he knew plaintiff, she was living in a house in Hagerstown on North Walnut street, in which the plaintiff and George Walter Bowman lived, and that it was at that time Bowman employed him to attend her as his wife, and that there was no one else living there to his knowledge.

Clyde B. Furst, a nephew of George Walter Bowman, testified that Bowman's father was a confectioner, named George R. Bowman, and that George Walter Bowman's mother's maiden name was Greenwalt; and that George Walter Bowman was a clerk in his father's confectionery store; that in 1890, he himself left Hagerstown for college, and after that was only home for visits.

Mrs. Zimmerman testified that Catherine McGranagan was her daughter by a former husband named Boyer; that she was born July 11th, 1863, which agrees with the certificate made July 12th, 1887, where her age is given as twenty-four.

Mrs. Zimmerman testifies that her daughter was adopted when she was between two and three years of age by John Mc-Granagan and Sarah, his wife, whose maiden name was Sarah Weaver, and a certified copy of an order of the Court of Common Pleas of Dauphin County, Pa., made in November, 1868, shows the legal adoption by John McGranagan and Sarah, his wife, of the child of Joanna Boyer, under the name of Catherine McGranagan.   Mrs. Zimmerman further testified that in July, 1887, George W. Bowman, whom she then first knew, came with her said daughter to her house in Harrisburg, stating that they came from Camden, New Jersey, where they had just been married, and that in the fall of the same year she visited them in Hagerstown on Walnut street, where they were living together, where she continued to live for a year or two.

Mary R. Westwood testified that her father, John R. Westwood, by whom said marriage ceremony purports to have been performed was on July 12th, 1887, pastor of the Third Street Methodist Episcopal Church in Camden, New Jersey, and that her name was signed by her as a witness to said marriage; that her father died in 1900, and that she witnessed many of his marriage ceremonies, and has no independent recollection of this ceremony.   George B. Wright, secretary of the Methodist Episcopal Conference of New Jersey, testified that Mr. Westwood was regulary ordained as a minister of the gospel in his presence in March, 1874.

Charles A. Little testified that he knew George Walter Bowman whom he called also George W. Bowman; that his father's name was George R. Bowman and his mother's name Catherine B. Greenwalt; that his father was a confectioner, and he himself was engaged in the same business for a time; and that he lived mainly in Hagerstown, but was away from there for a period of his life.   Why all this evidence, pointing as it seems to me, directly and plainly to the identity of both these parties, should be withheld from the jury, I am not able to see.

In the opinion of the Court it is said, that the certificate

gives Bowman's age as twenty-five, "when according to the
evidence he was twenty-seven years of age;" but I can find
no direct evidence to that effect. The only reference to his age
in the testimony, is made by Clyde B. Furst, who says, "I do
not know my uncle's age exactly but *think* he was born *about*
1860." If so, he was 27 in 1887, but this witness testifies
that he left home for college in 1890, and if he was then
twenty, which is above the usual age of entrance to college,
he would appear to have been born in 1870 and could con-
sequently have no personal knowledge of the age of one born
in 1860. But he disclaims *knowledge* and professes only to
give his *opinion*. Again, the Court says, "Catherine Mc-
Granagan actually lived in Hagerstown" when the certificate
gave her residence as E. Harrisburg. But I cannot find any
evidence of her residence there prior to the date of the mar-
riage in this certificate. Mrs. Zimmerman says, "After my
daughter left Harrisburg she was in Hagerstown for a year or
two," but she nowhere says that she ever left Harrisburg be-
fore the alleged marriage with Bowman. Irvin Bitner testified
that he had lived in Hagerstown since 1877 and was a Justice
of the Peace for about twenty years, and that "within that
time he knew a woman named Edith Boyer who lived in Ha-
gerstown," but he did not say, and was not asked, at what
period within the twenty years. The only dates he fixes are
October, 1887, and April, 1888, both subsequent to the date
given in the marriage certificate. Neither Wassen nor Benner
give any date whatever when she lived in Hagerstown, so that
I am at a loss to discover any testimony that her residence
was in Hagerstown when the marriage ceremony was per-
formed in Camden.

Again, the Court in its opinion, speaking of Mrs. Zimmer-
man's testimony relating to her visit to the plaintiff in the fall
of 1887 when she lived with Bowman on Walnut street, says,
"this is just as consistent with concubinage as with matri-
mony, when it is remembered that the house on Walnut street
was a house of ill-fame." The only evidence I can find in the
record as to any house of ill-fame in Hagerstown is the testi_

mony of Wassen and Benner who say that the plaintiff "was an inmate of a house of ill-fame in Hagerstown known as the *Arnold House* and that *afterwards* she lived on North Walnut street which was frequented by George Walter Bowman and a number of young men who are dead." Neither of these witnesses fixed any date when she was an inmate of the Arnold House, nor do either of them say the Walnut street house was a house of ill-fame. But if we assume it was such, I am unable to see how that can affect the question to which alone the prayers under consideration are addressed, viz, the identity of these parties. A prostitute may be made a lawful wife, by a valid ceremonial marriage, where the husband has knowledge of the character and conduct of the woman he takes to wife, and a divorce is as necessary to dissolve such a marriage as any other. If she becomes impure after marriage, and he continues to cohabit with her after discovery, he condones the offense, and her conduct affords no ground for a divorce, which could not, in such case, be presumed to have been obtained. When, as in *Jackson* v. *Jackson*, 80 Md. 192, and 82 Md. 132, it is sought to establish the fact of marriage by the mere presumption arising from cohabitation and repute, evidence of want of chastity before the alleged marriage, and during the period of cohabitation, is admissible to rebut the presumption that the cohabitation was the sequence of lawful marriage, but it cannot tend to disprove a lawful marriage established by proper evidence, nor can it reflect any light upon the question of the identity of the parties to the alleged marriage, and if it did, that would be a consideration for the jury.

Suppose that there was no allegation of a second marriage in this case, but that there was issue of the alleged marriage with Catherine McGranagan, and that Clyde B. Furst, the nephew of the deceased, who, in that situation, would be entitled to the whole of his personal estate if the marriage with Catherine McGranagan were not established, was seeking to withdraw the case from the jury upon the question of the identity of the parties, upon the same testimony given here.

If he should succed in that effort, the result would be to bastardize the innocent issue of that alleged marriage. Can it be supposed that in such case the Court would say there was no evidence legally sufficient to prove the identity of the parties to that marriage? And if sufficient in that aspect of the case, why not in the present aspect of the same case? The probative force of testimony offered to establish an alleged marriage cannot be held sufficient for the jury where there is issue of the marriage, and insufficient where there is none, nor can it be excluded *merely* because it may tend to bastardize the issue of a second alleged marriage, nor admitted *merely* because it may operate to relieve the issue of a contested marriage. The legal sufficiency of testimony to prove any fact in issue depends exclusively upon its relevancy to that issue, and its probative force as applied to that fact alone. It cannot be made to depend upon any mere adverse presumption, nor upon how it may affect the result of the case. It must depend solely upon its quality as the basis of any rational conclusion as to the fact in issue, and it cannot be held sufficient, merely to accomplish a certain result, however favored in morals or in law, and held insufficient merely in order to defeat a contrary result, however deprecated.

I therefore think the Circuit Court was clearly correct in rejecting the defendant's first and second prayers, and in submitting the identity of the parties to the determination of the jury. The plaintiff's fifteenth prayer asserted the proposition that "the similarity of names in the marriage certificate offered in evidence by the plaintiff, with the names of the plaintiff and the decedent, G. Walter Bowman, raises a presumption that these persons are the same," but it was refused. None of the prayers, except the defendant's first and second prayers, were discussed in the opinion of the Court, and the plaintiff's fifteenth prayer would not be adverted to here, but for the fact that it is addressed to the same question of identity so fully considered by the Court in passing upon the defendant's first and second prayers. I think it should have been granted. The opinion of JUDGE STONE in the Circuit Court in *Brooke* v.

*Brooke*, 60 Md. 528, as to the identity of Henry Brooke, printed at length in the report, and approved by the Court in affirming the judgment, affords strong support for this instruction, and the law was distinctly so declared in *Clark* v. *Pearson*, 53 Geo. 496, and in *Wilson* v. *Holt*, 83 Ala. 528. In the former case it was held that the identity of the name and county of the person in whose name the action was brought with the name and county of one on whose estate administration had been previously granted constituted *prima facie* evidence that such plaintiff was dead. In the case at bar, this *prima facie* identity is strengthened by the confirmation of the description of Bowman's occupation, and the names of his parents, as well as the names of Catherine McGranagan's adopted parents, as given in the marriage certificate.

In the Alabama case, Dr. Robert S. Wilson had been divorced in Georgia at the suit of his first wife, and had married again in Alabama where the law prohibited the marriage of the guilty party. To sustain the validity of his subsequent marriage, reliance was placed upon an Act of the General Assembly of Alabama relieving Robert S. Wilson of all penalties and disabilities which by law attach to persons from, or against whom, a divorce has been ordained in any State. It was held that the identity of name in this Act, with that of the complainant's father, who was then a resident of Montgomery County, Alabama, was *prima facie* evidence of identity of person, and was sufficient proof of the fact, unless it was shown that the name was a very common one in that part of the country, or unless there were other facts throwing doubt on the supposed identity; and in support of this ruling the Court cited *Wharton on Evidence*, sec. 701. That case involved title to land, and this title depended upon the validity of Dr. Wilson's second marriage, which in turn depended upon his identity with the Robert S. Wilson whose disabilities were removed by the Act of Assembly mentioned. In section 99 of *Jones on Evidence*, a number of cases are cited sustaining the principle and illustrating its application, and also in a note to *Rupert* v. *Penner*, 17 L. R. A. 824.

The opinion of the Court sustained all the rulings of the lower Court in refusing all the questions propounded to the plaintiff when offered as a witness in her own behalf. The lower Court stated the ground of this ruling to be that she was not a competent witness in this cause under ch. 661 of 1904, but with that ruling I cannot agree. The Act works only a partial exclusion, *i. e.*, as to "any transaction had with or statement made by the intestate, unless called to testify by the opposite party, or unless the testimony shall have already been given in evidence concerning the same transaction or statement." I do not understand that the Court adopts the *ground* of these rulings, though it finds no error in them; stating that the evidence thus excluded "either tended to prove the identity of the plaintiff, or it did not. If it did it was inadmissible because she was incompetent to prove that identity. If it did not tend to prove her identity, it was irrelevant." But with this I cannot agree. I do not of course dispute that she could not herself testify to the fact of her marriage at the time and place alleged, that being "a transaction had with the deceased," but I do not understand that she was incompetent to testify to any independent fact, not being a transaction with, or statement made by the deceased, merely because that fact, when established, would tend to prove her identity. Nor does it follow that the proffered testimony was irrelevant unless it tended to prove her identity. The third and eighth exceptions, which related to her present name, and to the destruction by Bowman of her marriage certificate, I think were correctly ruled on, as relating to transactions had with the deceased, and *perhaps* the fourth which related to her maiden name may come within this category, but the fifth, which asked her mother's name, where she was born, where she lived on July 12th, 1887, the name of her father and where he lived at that time; the sixth which asked where she was on July 12th, 1887, and if she ever met John R. and Mary Westwood, and where, and what were their occupations; the seventh, which asked if she knew a man named George W. Bowman in July, 1887, and whether he was then in Camden,

New Jersey; and the ninth which asked her who were John and Sarah McGranagan, and how long and with whom she lived in Hagerstown, were all in my opinion improperly rejected.

The fourteenth, fifteenth sixteenth and seventeenth exceptions were taken to the refusal of the following questions in rebuttal, after Bitner, Wassen and Benner had testified to her going under an alias, and to being an inmate of a house of ill fame while in Hagerstown. These questions were as follows:

14th. What is your name and did you ever go by the name of Edith Boyer in Hagerstown?

15th. Were you while in Hagerstown, at any time the inmate of a house of ill fame?

16th. Did you ever have sexual intercouse while in Hagerstown with a married man?

17th. Did you ever have improper relations while in Hagerstown with any other man than George W. Bowman?

In my opinion these questions should all have been allowed. If the law had made her incompetent as a witness in that cause for any purpose whatever, it would have been in vain for her to except as she did. But the law only makes her incompetent to prove transactions or conversations with the deceased, and to my mind the law never contemplated so cruel an injustice as to muzzle a woman in her situation, and refuse her the right to deny any attacks upon her character, however gross or slanderous. If allowed to deny them, the jury might have believed her denial and disbelieved her accusers who refused to give the names of those whom they represented as partners in her shame. This evidence was all relevant to the presumption of a divorce founded upon this alleged misconduct, and upon which the case actually turned under the instructions in the lower Court; and I have already shown why, and how, in my judgment, there was abundant evidence of the identity of the parties to the alleged marriage, and if I am correct upon that point, the relevancy of the excluded evidence cannot be denied.

The other prayers in the case were not discussed by the Court in its opinion, which did not commit the Court to the

accuracy of .any of the rulings on the prayers, if it had found sufficient evidence tending to prove the identity of the parties to the alleged first marriage, but the lower Court in granting the defendant's thirteenth prayer, in effect ruled that a divorce from a former wife who is still living, will, in the absence of other evidence, be presumed from the mere proof of the husband's second marriage, and the opinion of this Court gives *apparent color to the approval of that doctrine*, in its reference to, and approval of, *Rex* v. *Twyning*, 2 Barn. & Alderson, 386. Upon this question there is much conflict of authority, text writers and Judges of eminence, being found for and against this doctrine.

I do not understand *Le Brun* v. *Le Brun*, or any Maryland case to go to that extent, and it will be found that all the cases which sustain that doctrine go back to, and rest upon, *Rex* v. *Twyning, supra.* But the authority of that case as sustaining that doctrine has been questioned and much shaken in the English Courts in *Rex* v. *Harborne*, 2 Adol. & Ellis, 540; in *Lapsley* v. *Grierson*, 1 Houses of Lords Cases, 498, and in *Regina* v. *Wiltshire*, Law Reports, 6 Q. B. Div. 366. In *Lapsley* v. *Grierson*, LORD CAMPBELL said, "what MR. JUSTICE BAYLEY said in *Rex* v. *Twyning* has been much misunderstood." In *Rex* v. *Harborne*, LORD DENMAN said, "therecan be no rigid presumption of law upon such a question of fact;" and in *Regina* v. *Wiltshire*, JUSTICE HAWKINS, in speaking of the presumption of the death of a former wife in an inquiry into the validity of a second alleged marriage, said, "the only evidence of her death was that the prisoner presented himself as a bachelor to be married in 1879. Whether that would have satisfied the jury that his former wife was then dead was a question for them to decide, but it was not left to them."

The view taken in these English cases is the view which prevails in what I believe to be the best considered American cases, among which are *Williams* v. *Williams*, 63 Wis. 65; *Ellis* v. *Ellis*, 58 Ia. 720; *Gilman* v. *Sheats*, 78 Ia. 499, and *Randlett* v. *Rice*, 141 Mass. 385. I shall not enter into any consideration of this question since I do not understand that

the opinion in this case commits the Court in that regard, notwithstanding the apparent approval given to *Rex* v. *Twyning*—, but I wish to be understood as not assenting to the granting of the defendant's thirteenth prayer.

I think that the judgment should have been reversed.

(Filed August 24th, 1905.)

McSHERRY, C. J., delivered the following supplemental opinion.

I saw this morning in the "Daily Record" of last Friday and Saturday, the dissenting opinion of JUDGE PEARCE in the case of *Bowman* v. *Little*, and as it is likely that I failed to be as explicit as I ought to have been, in the reasoning employed and the conclusions expressed in the opinion of the majority of the Court in the same case, I think I should restate some of the principles which I believe must be kept constantly in mind, so that whilst the exact situation presented by the record is remembered, the precise things decided, in view of *that* situation, may not be misunderstood.

In the beginning of the dissenting opinion the following sentences occur: "Certainly, proof of the marriage of the plaintiff at the time and place alleged by her, is indispensable to her recovery, but in inquiring 'what kind of evidence is necessary to establish that *status* or relation, and of what probative value it should be,' it is not neceessary to controvert that there must be strict proof of such marriage 'as an actual fact' as stated in *Taylor* v. *Taylor*, 5 Eng. Ecc. Rep. 454. I do not understand, however, that 'strict proof,' either as applied to identity of persons; or any other issue of fact, is the equivalent of a mathematical demonstration, or that in determining the identity of parties to an alleged marriage, it can only be satisfied by the testimony of living witnesses to the performance of the marriage ceremony." Now, the precise inquiry with which the majority opinion dealt was, as stated in that opinion, "What kind of evidence is necessary, to éstablish that *status* or relation (the alleged New Jersey marriage) and of what probative value should it be, *when the consequences inci-*

*dent to the sustentation of the alleged marriage of July, 1887, must inevitably be the branding of the deceased with the crime of bigamy and the bastardizing of the innocent offspring of the marriage of 1900?"*   It was with reference to *that* situation, *thus presented,* that the inquiry was made as to what *kind* of evidence was requisite to establish an alleged antecedent marriage, and as to what quality or probative value that evidence should possess, and it was not in relation to the simple issue of marriage *vel non,* or *legitimacy vel non,* as in *Jones* v. *Jones,* 45 Md. 144. The controlling question was whether there was *any* legally sufficient evidence to go to the jury *in the circumstances of this case,* to establish the identity of the persons named in the New Jersey marriage certificate. It was therefore a question of the *legal sufficiency* of the evidence and not of its *admissibility* or its weight when contrasted with conflicting evidence. Evidence may be admissible to prove a fact and yet when admitted may be legally insufficient to prove the fact which it was introduced to prove. When it tends to prove the fact it is for the jury to say whether it does prove it; when it is legally insufficient to prove the fact it is the duty of the Court, upon request, to instruct the jury to that effect. The standard or measure by which the legal sufficiency of evidence is ascertained is not unvarying and inflexible, and hence is not the same in every case. That which would be legally sufficient evidence to establish a marriage when nothing but the mere question of marriage *vel non* is presented, would not necessarily be legally sufficient to establish a prior marriage when the consequence incident to upholding the latter would be to convict one of the parties of crime or to bastardize the offspring of a subsequent marriage; because the conditions are essentially different and because in the one instance there may, and most likely would be, no presumptions either in favor of or against a marriage, whilst in the other there will always be most important presumptions in favor of innocence and legitimacy. These latter presumptions which invariably arise in a case like the present one, must be overthrown by legally sufficient evidence before there can be said

to be any legally sufficient evidence of the alleged first marriage to go to the jury; and it is always a question of law for the Court to determine whether any legally sufficient evidence has been adduced to destroy those strong presumptions. In so deciding the Court does not invade the province of the jury, because the province of the jury is only to weigh and pass upon such evidence as the Court shall determine to be legally sufficient if true to establish the fact to be proved. Now, the whole trend of the argument in the majority opinion showed or was intended to show that the entire evidence offered by the plaintiff on the subject of personal identity consisted merely of a series of *probabilities;* that no number of *probabilites* could constitute "strict proof," because the sum total of them all would at best be itself only a *probability* which was not equivalent to a moral certainty and which because only a probability, could never wholly exclude the opposite probability: That this mere probability could not contravene the presumptions of innocence and legitimacy arising from the undoubted fact of the second marriage for these presumptions outweighed a mere probability and therefore that it (the mere probability) furnished no legally sufficient evidence to go to the jury to prove the first marriage.

The majority opinion dealt only with conjectural probabilities which, in the absence of any thing of greater probative value, were assumed, *ex gratia argumenti*, to be inferable from the facts stated in the record. It was not denied and it is not now doubted that it is *possible* those people were married at Camden as the plaintiff insists in her petition. But a *possibility* must not be confounded with a *probability*, because *probability* belongs not to things, but to our calculations about things; whilst *possibility* is of the essence of things. The probable is always possible, but the improbable is equally so, and the possible may be probable or improbable, that is, may or may not happen. As possibility, in so far as it is nothing but a potentiality until it ceases to be a mere possibility and becomes a reality, has no probative value whatever, Courts cannot regard a bare possibility as an evidentiary fact.

As the requirement demanding "strict proof" could not be gratified by furnishing evidence which established nothing more than a mere *probability*, and as a bare *possibility* has no probative value, the presumptions of innocence and legitimacy prevailed, *as a matter of law*, and left nothing contravening them for the jury to consider. The legally insufficient evidence because legally insufficient, created no conflict between itself and the existing presumptions and hence there was nothing to carry the question of personal identity to the jury.

In the dissenting opinion this supposititious case is put: "Suppose that there was no allegation of a second marriage in this case, but that there was issue of the alleged marriage with Catharine McGranagan, and that Clyde B. Furst, the nephew of the deceased, who, in that situation, would be entitled to the whole of his personal estate if the marriage with Catherine McGranagan were not established, was seeking to withdraw the case from the jury upon the question of the identity of the parties, upon the same testimony given here. If he should succeed in that effort, the result would be to bastardize the innocent issue of that alleged marriage. Can it be supposed that in such case the Court would say there was no evidence legally sufficient to prove the identity of the parties to that marriage?" I answer, most unquestinoably in *that supposed case* the Court could *not* declare the evidence of identity to be legally insufficient, because that evidence would be in harmony with and in *support* of the legal peresumption in favor of the legitimacy of the supposed issue, and would *not* be, as it *is* in the case actually presented, in *conflict* with that presumption. In the supposed case, you start with the presumption of *legitimacy*, as to the issue of the marriage to Catherine McGranagan, and the evidence adduced would *strengthen* that presumption and would not antagonize it; whereas in the real case, that same evidence is adduced, not to support a presumption *consistent* with it, but to overthrow two *adverse* presumptions, namely, the presumption that the deceased was innocent of the crime of bigamy, and the presumption that the issue of the second marriage was legitimate. It is because, in

the supposed case, the evidence does *not* clash with any legal presumption that it would not be excluded; and it is just precisely because it *does* clash with, and is not definite enough to constitute strict proof to refute, two contrary legal presumtions, that it is legally insufficient to prove identity in the present aspect of the case. The aspect of the supposed case is diametrically opposite to the aspect of the actual case, and no analogy exists between them. The evidence is excluded not *merely* because it may tend to bastardize the issue of a second marriage, nor would it be admitted *merely* because it might operate to relieve the issue of a contested marriage; but it would be excluded, in the one case, because *too inconclusive* to overthrow the legal presumption of legitimacy; and it would be admitted in the other instance, because though if of itself without more too inconclusive to establish the fact of marriage, it would still tend to *support* the presumption of legitimacy which implicitly includes an anterior presumption of marriage; for there can be no legitimacy where there has been no marriage. Whilst the legal sufficiency of evidence to support an issue cannot be made to depend "upon how it may affect the result of the case," it may in some instances be made to depend upon whether in law it is definite or conclusive enough to overthrow an intervening and existing legal presumption. If it is not legally sufficient in the opinion of the Court to do that, then it is not legally sufficient to go to the jury. That is the precise point decided in the case.

There is not a suggestion in the majority opinion that either the writer of it or any Judge who concurred in it, supposed that "strict proof" is, in any instance, "the equivalent of mathematical demonstration." What we did say was that improbable inferences could not be permitted to take the place of strict proof, and that such inferences were powerless to overcome the presumptions of innocence and legitimacy, because those presumptions yield only to *evidence* which is sufficient to establish a mental conviction which amounts to a *moral certainly.* Now, a "mathematical demonstration" is wholly different from a "moral certainty." Evidence of dem-

onstration relates to *necessary* truths—truths as to which the supposition of the contrary involves not merely what is not and cannot be true, but what is also absurd—whereas moral evidence is the basis of *contingent* truth. It follows obviously, that the convictions which these distinct and dissimilar classes of evidence are capable of producing are necessarily of very different natures. In the one, absolute certitude is the result; to which moral certainty, the highest degree of assurance of which truths of the latter class admit, is necessarily inferior. *Wills Cir. Ev.*, 5. Moral certainty is that full and complete assurance which admits of no degrees, and induces a sound mind to act without doubt upon the conclusions to which it naturally and reasonably leads. 2 *Stewart's Elements*, ch. 2, sec. 4. It is apparent, then, that the precision attainable in the one case is of a nature of which the other does not admit. It would be strange to require the proof of an historic fact or of an ordinary event or occurrence by the same kind of evidence and reasoning as that which establishes the equality of triangles upon equal bases and between the same parallels; and there is nothing whatever in the majority opinion from which it can be inferred that when we said "strict proof," *in this case*, meant proof which would produce an assurance amounting to moral certainty, we had the slightest reference to a mathematical demonstration.

It is objected in the dissenting opinion that reliance was placed upon an assumed fact as to Bowman's residence, when in reality the record showed the majority opinion was wrong in saying that the marriage certificate described Bowman as being a resident of "*Haleystown.*" The truth is the *printed record* is wrong. The original certificate on file in the Orphans' Court of Washington County distinctly states that Bowman lived in "Haleystown"—not Hagerstown—and hence the conclusion drawn from that circumstance and relied on in the Court's opinion, is not open to criticism. This Court has the right to verify or correct the printed record by referring to the original documents. (Art. 5, sec. 52, Code.) If this were not so a printer's error might totally change an issue raised

and control the decision of a controversy. We said, "The certificate shows that George W. Bowman of *Haleystown* was married to Catharine McGranagan of E. Harrisburg, Pennsylvania; but it does *not* show that *the* George W. Bowman therein named was the identical G. Walter Bowman of *Hagerstown*, whose estate is involved in this controversy." That proposition differs very widely from the interpretation placed upon it in the dissenting opinion. I quote from the latter: "I allude," says Judge Pearce, "to this here, because in the opinion of the Court it is said this certificate, *for that reason*" (the inaccurate statement as to residence) "does not show, that the George W. Bowman named therein was from *Hagerstown*, but does show that he was from *Haleystown, and therefore that he was not the same George W. Bowman* whose estate is here in controversy." What we said was that the certificate *failed* to show the identity of Bowman—that it does *not* show that the person named therein was the same person whose estate was in controversy; but that is very far from saying, "*therefore* he was *not* the same" Bowman whose estate was in controversy. There is a distinction between a *failure* to show the *identity* of an individual, and a statement that the individual is *not* the person he is asserted to be. In the one case *nothing* is predicated of identity; in the other you distinctly aver that the Bowman named in the certificate is *not* the Bowman whose estate is in controversy. We did not make the latter averment or draw a similar deduction, because from a total failure to show *anything* as to identity it would have been logically impossible to infer a positive conclusion respecting identity.

There is another matter to which I wish to allude. As the marriage certificate standing alone proved nothing but that *a* marriage of *some* man to *some* woman had been performed, it was utterly valueless as evidence for the plaintiff until the *identity* of that man and that woman had been established. The "transaction had with" the deceased in his lifetime by the plaintiff was the alleged New Jersey marriage. To prove that "transaction" it was not only necessary to prove that a marriage

ceremony had been performed, but further that the *plaintiff* was the identical woman who did marry Bowman. Consequently her personal identity as an integral and essential constituent of the "transaction had with" Bowman, cannot be segregated from that "transaction" and cannot be treated as an independent circumstance. Hence whatever disability she was under to prove by her own testimony the *fact* of marriage equally included the proof in the same way of her identity as a party to that marriage. It is conceded that the plaintiff could not go on the witness stand and say, "I am the Catharine McGranagan who married George W. Bowman." If this be so, upon what principle can she be allowed to testify to facts A, B, C, and D, which if they prove anything, prove the very identity that she could not establish by her direct testimony? Her identity except as indicating that she was a party to the alleged marriage was wholly irrelevant. If she were permitted to testify to collateral facts from which that identity could be inferred, she would *indirectly* testify to the "transaction had with" the deceased, though expressly inhibited from testifying *directly* to that fact. The difference between proving by direct testimony a transaction with a man since deceased, and proving the same transaction by proving facts from which the transaction may be inferred, is a difference in the kind of evidence adduced and not a difference in the thing to be proved. In the one case the evidence is direct, in the other it is circumstantial, but in both the fact to be proved is precisely the same transaction. The statute declares that "no party to a cause shall be allowed to testify as to any transaction had with" a person since deceased; but it does not say the restriction shall extend no farther than to the exclusion of *direct* testimony. Proving a transaction by witnesses is testifying as to a transaction, whether that testimony be direct or circumstantial; and the disqualification which, by the way, was not imposed by the statute, but existed antecedently, applies to a party situated as the plaintiff is, without any regard to the *nature* of the testimony, that is to say, without reference to whether it is direct or circumstantial. In the dissent-

ing opinion it is said "to my mind the law never contemplated so cruel an injustice as to muzzle a woman in her situation and refuse her the right to deny any attacks upon her character however gross or slanderous."

It was a general rule of the common law that a *party* to the record in a civil case could not be a witness either for himself or for a co-suitor in the cause; and that rule obtained in Maryland until the adoption of the Evidence Act of 1864. By the Act just named the disqualification arising from interest was to a great extent but not wholly removed. Except in those instances where that disqualification has been so removed, it still continues; but it continues because it antecedently existed at the common law, and not because it has been imposed to "muzzle" a litigant.

It is a mistake, I submit, to suppose because we cited and relied on the case of *Rex* v. *Inhabitants of Twyning*, that we thereby "gave apparent color" to the doctrine that a *divorce* from a former wife, who is still living, will in the absence of other evidence, be presumed from the mere proof of the husband's second marriage. And it is a mistake to suggest such a supposition because, first, Twyning's case determines nothing of the sort, and by citing the case to support an entirely different proposition we cannot be held to have approved something it did not decide at all; and because, secondly, we expressly declined to commit ourselves to that very proposition; and because, thirdly, having distinctly determined that there was no legally sufficient evidence of the *identity* of the parties named in the New Jersey certificate, and, therefore, that there was no legally sufficient evidence that the *plaintiff* had ever been married to G. Walter Bowman, it would have been palpably illogical as well as flatly contradictory to say that there was a *presumption* that he had obtained a divorce from her; because a divorce necessarily presupposes a valid marriage. The precise situation in Twyning's case, which as stated in *Best on Presumptions*,(p. 58 marg.) "is certainly one of the leading authorities on the subject of conflicting presumptions," was shortly this : the wife of a person, who enlisted and went

abroad as a soldier, and was never afterwards heard of, had married another man in little more than twelve months after the first husband's departure.   There was a presumption that the woman was not guilty of the crime of bigamy and that the issue of the second marriage was legitimate. There was also a conflicting presumption that the first husband was still alive; but the Court of Queen's Bench held that the presumption of innocence—the presumption that the woman was not guilty of the crime of bigamy—should prevail until disproved; and that the counter presumption, or *probability*, that the first husband was *alive* when the second marriage took place, *did not* disprove the presumption of innocence.   The principle is a familiar one and prevails in civil as well as in criminal cases, though in some exceptional instances it has been held not to be applicable by reason of their peculiar circumstances.   The presumptions of innocence and of legitimacy are *præsumptiones juris* and are good until disproved.   The former has been held, under some conditions, to prevail, *as a matter of law*, over the conflicting presumption respecting the continuance of life.   1 *Jones Ev.*, sec. 100; *Kelly* v. *Drew*, 12 Allen, 107.   In the last cited case *Rex* v. *Twyning* was relied on by the Supreme Judicial Court of Massachusetts.   It was expressly approved by this Court in *Jones* v. *Jones*, 48 Md. 398; and in 1 *Green. Ev.*, sec. 35; 1 *Jones on Ev.*, sec. 100, note 1; *Roscoe on Ev.*, 15; 1 *Starkie Ev.*, 379; 22 *Am. & Eng. Ency. L.*; 1282, note 5, and note to *Coffin* v. *U. S.*, 156 U. S. 432.   In the last-named case the Supreme Court used this forcible language: "In other words, this presumption (of innocence) is an instrument of proof created by the law in favor of one accused, whereby his innocence is established until sufficient evidence is introduced to overcome the proof which the law has created."   We held in the majority opinion that no legally sufficient evidence of the identity of the parties named in the New Jersey certificate had been introduced to overcome the presumptions of innocence and legitimacy; and distinctly refrained from going into any discussion as to a presumption concerning a divorce.

September 18th, 1905.

(Filed October 3rd, 1905.)